# United States Court of Appeals for the Federal Circuit

2008-5092,-5093

PRECISION PINE & TIMBER, INC.,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.


Richard W. Goeken, Saltman & Stevens, P.C., of Washington, DC, argued for plaintiff-cross appellant. With him on the brief was Alan I. Saltman.

David A. Harrington, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Bryant G. Snee, Assistant Director.

Appealed from: United States Court of Federal Claims

Judge George W. Miller

# United States Court of Appeals for the Federal Circuit

2008-5092, -5093

PRECISION PINE & TIMBER, INC.,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 98-CV-720, Judge George W. Miller.

_____

DECIDED: February 19, 2010

_____

Before MAYER, LOURIE, and PROST, Circuit Judges.

PROST, Circuit Judge.

This is a government contract case. We must decide whether the federal government's suspension of fourteen contracts breached any express or implied warranties. These fourteen contracts are between the U.S. Forest Service and Precision Pine & Timber, Inc. ("Precision Pine"), and provide for timber harvesting in Forest Service Region 3, which covers Arizona's national forests. In August 1995, the Forest Service suspended the contracts pursuant to a court order. The order prohibited further timber harvesting in that region until the Forest Service consulted with the U.S Fish and Wildlife Service about the pertinent land resource management plans. See Silver v. Babbitt, 924 F. Supp. 976, 989 (D. Ariz. 1995). The order explained that such consultation was required under § 7 of the Endangered Species Act, 16 U.S.C. § 1536,

due to the recent listing of the Mexican spotted owl as an endangered species. The fourteen contracts remained suspended until completion of the consultation process in December 1996.

Precision Pine subsequently brought this suit in the U.S. Court of Federal Claims, alleging that suspension of the contracts breached both express and implied warranties. The trial court agreed with Precision Pine. On liability, it granted summary judgment in favor of Precision Pine, concluding that the government breached both an express contractual warranty and the implied duty of good faith and fair dealing. Precision Pine & Timber, Inc. v. United States ("Precision Pine I" or "liability decision"), 50 Fed. Cl. 35, 65-72 (2001). Following this decision, the case was transferred to a different judge for the sole purpose of adjudicating damages. After five years of discovery, a twenty-four day bench trial, and extensive supplemental briefing, the trial court awarded $3,343,712 in damages to Precision Pine. Precision Pine & Timber, Inc. v. United States ("Precision Pine V" or "preliminary damages decision"), 81 Fed. Cl. 235, 294 (2007); see also Precision Pine & Timber, Inc. v. United States ("Precision Pine VI" or "final damages decision"), 81 Fed. Cl. 733, 739-40 (2008). The United States now appeals the liability determination and damages award. We reverse.

Although the contract dates and terms differ slightly, for our purposes the issues posed are the same. Seven of the contracts present the question of whether a particular clause (CT 6.25) created an express warranty and, if so, whether it was breached. If CT 6.25 did create an express warranty, then we must also decide whether the government breached its implied duty to cooperate as to those contracts.

For eleven of the contracts, we must also decide whether the United States breached its implied duty not to hinder.[1]

We conclude that the answer to each of these questions is no. Clause CT 6.25 of the contracts did not create an express warranty, and the Forest Service's actions did not breach any implied duty to cooperate or not to hinder. Accordingly, we reverse the trial court's liability decision and vacate the damages award for all contracts, except the Hay contract. Because the government concedes it lacked authority to suspend the Hay contract,[2] we remand for further proceedings as to that contract. For the other thirteen contracts, the trial court should enter judgment for the United States.

BACKGROUND

The Forest Service is the agency charged with administering and maintaining national forests throughout the United States. See 16 U.S.C. §§ 551, 551a, 559e. National forests are not the same thing as national parks. National parks, like Yosemite and Yellowstone, were created to conserve the scenery, wildlife, and objects (natural and historical) within their boundaries, preserving them "unimpaired for future

---

[1] Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing. See, e.g., Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'"); Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988); see also La.-Pac. Corp. v. United States, 656 F.2d 650, 652-53 (Ct. Cl. 1981); Lewis-Nicholson, Inc. v. United States, 550 F.2d 26, 32 (Ct. Cl. 1977); Peter Kiewit Sons' Co. v. United States, 151 F. Supp. 726, 731 (Ct. Cl. 1957).

[2] Unlike the other thirteen contracts, the Hay contract does not contain clause CT 6.01. CT 6.01 gives the Forest Service unilateral suspension authority. See infra Part I.B. On appeal, the Forest Service does not dispute that the absence of this provision means it lacked authority to suspend this contract.

generations." The National Park Service Organic Act of 1916, 39 Stat. 535 (Aug. 25, 1916), (codified at 16 U.S.C. §§ 1-4). By contrast, national forests were created not only to conserve resources, but also to provide access to, and facilitate use of, their resources. See Forest Reserve Act of 1891, 26 Stat. 1103, (codified as amended at 16 U.S.C. § 471), repealed by Federal Land Policy and Management Act, Pub. L. No. 94-579 (Oct. 21, 1976); Forest Service Organic Administration Act, 30 Stat. 11 (June 4, 1897) (codified as amended at 16 U.S.C. §§ 473-478, 479-482, 551); Multiple Use – Sustained Yield Act of 1960, 74 Stat. 215 (June 12, 1960) (codified as amended at 16 U.S.C. §§ 528-531); see also National Forest Management Act of 1976, 90 Stat. 2949 (Oct. 22, 1976) (codified as amended at 16 U.S.C. §§ 1600-1614). Consistent with this mission, national forests are used for timber, minerals, water, grazing, and recreation. In its management capacity over national forests, the Forest Service has the authority to enter into timber harvesting contracts with private companies on behalf of the United States. 16 U.S.C. § 472a.

This case is about fourteen contracts the Forest Service awarded between June 1991 and July 1995. All of these contracts contain similar terms, which required Precision Pine to cut and remove the specified timber by the contract's termination date. Each contract established an operating season for harvesting the timber and prescribed the general harvesting methods Precision Pine could use. With one exception, all of the contracts also contained Special Contract Provision CT 6.01, titled "Interruption or Delay of Operations." CT 6.01 gave the Forest Service the right to suspend operations under the contract. The authority of the Forest Service to suspend Precision Pine's timber

contracts pursuant to this provision became relevant because of a small animal popularly known as the Mexican spotted owl.

In April 1993, the Fish and Wildlife Service listed the Mexican spotted owl as an endangered species. See Endangered and Threatened Wildlife and Plants; Final Rule To List the Mexican Spotted Owl as a Threatened Species, 58 Fed. Reg. 14,248 (Mar. 16, 1993). The listing of the owl triggered various statutory and regulatory obligations under the Endangered Species Act ("ESA"). Specifically, the ESA requires federal agencies, like the Forest Service, to consult with the Fish and Wildlife Service to ensure that any action "authorized, funded or carried out by such agency is not likely to jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2); see also 50 C.F.R. § 402.01(b). While such consultations are taking place, § 7(d) of the ESA prohibited the Forest Service from making any "irreversible or irretrievable commitment of resources" during the consultation process. 16 U.S.C. § 1536(d).

After the listing decision, the Forest Service began formal consultations regarding several Region 3 projects that it determined "m[ight] affect" the Mexican spotted owl. It also began informal consultations about amending the Land Resource Management Plans ("LRMPs") for Region 3 to incorporate management direction for the owl. As the name suggests, a LRMP is intended to guide the use and management of natural resources within a part of the national forest system. See id. § 1604(a), (b). Every national forest has an LRMP, which the Forest Service is responsible for developing, maintaining, and updating as necessary to account for changed circumstances. Id. § 1604(f)(6). Activities occurring within a national forest, such as timber harvesting,

must be "consistent with" the applicable LRMP.  Id. § 1604(i).  The Forest Service did not submit any of Region 3's existing LRMPs for formal consultation with the Fish and Wildlife Service.  It instead maintained that the ESA required no further formal consultation about the existing LRMPs, because those LRMPs had already been subject to formal consultation, albeit before the Mexican spotted owl listing decision.

The U.S. Court of Appeals for the Ninth Circuit reached a contrary, binding conclusion in Pacific Rivers Council v. Thomas, 30 F.3d 1050 (9th Cir. 1994).  In Pacific Rivers, the Ninth Circuit held that all LRMPs (new and existing) constitute ongoing "agency actions," requiring formal consultation whenever a new species is listed as threatened or endangered.  Id. at 1055-56.  The Ninth Circuit further explained that pursuant to its decision in Lane County Audubon Society v. Jamison, 958 F.2d 290 (9th Cir. 1992), timber sales were "per se irreversible and irretrievable commitments of resources under section 7(d) [of the ESA], and thus could not go forward during this consultation period."  Pac. Rivers, 30 F.3d at 1057.

In August 1994, less than a month after the Ninth Circuit's decision in Pacific Rivers, several environmental groups filed suit in the U.S. District Court for the District of Arizona.  The groups sought an injunction that would halt all timber harvesting in Region 3, including harvesting pursuant to Precision Pine's contracts.  Silver, 924 F. Supp. at 980.  While this litigation was ongoing, the Forest Service began informal consultation on "all relevant aspects of the Forest Service Plans [(LRMPS)]" and stated its intention to begin formal consultations about amendments to the LRMPs.  Id. at 981. In July 1995, the Forest Service initiated formal consultation with the Fish and Wildlife

Service "on the effect of the Mexican [s]potted owl and its critical habitat from implementation" on the as-amended LRMPs. Id.

On August 24, 1995, the Arizona district court granted the environmental plaintiffs' motion for partial summary judgment in Silver, 924 F. Supp. at 989. In Silver, the court determined that the Forest Service's site-specific consultations on the existing LRMPs and planned consultation on the amended LRMPs, did not satisfy the requirements of ESA § 7(a). Based on the Ninth Circuit's decision in Pacific Rivers, the Arizona district court also held that § 7(d) of the ESA barred all new, ongoing, and announced activities during the consultation period that the Forest Service determined "m[ight] affect" the Mexican spotted owl. Id. at 989. Among these activities were the timber harvesting contracts in Region 3. Based on these conclusions, the court ordered the Forest Service to:

(1) [I]mmediately commence re-consultation on existing LRMPS in Region 3 in compliance with Section 7(a)(2) of the ESA and its relevant regulations to consider the listing of the Mexican spotted owl as threatened.

(2) Pursuant to Section 7(a)(2) of the ESA . . . defer or suspend all timber harvest activities taken pursuant to the Region 3 LRMPs until the required consultation commences.

(3) Pursuant to Section 7(d) of the ESA . . . defer or suspend all timber harvest activities until the re-consultation on existing and amended LRMPS in Region 3 is complete.

Id.

Pursuant to the Arizona district court's order in Silver, the Forest Service requested formal consultations with the Fish and Wildlife Service on September 6, 1995. The consultations began in early November 1995. While those consultations were ongoing, Precision Pine's timber contracts remained suspended pursuant to the

injunction in Silver. The Arizona district court dissolved the injunction on December 4, 1996, over a year after its initial order. Precision Pine V, 81 Fed. Cl. at 241.

While the contracts were suspended pursuant to the injunction, Precision Pine informed the Forest Service that it considered the Forest Service to have breached the timber contracts. Precision Pine V, 81 Fed. Cl. at 242; see also Precision Pine & Timber, Inc. v. United States ("Precision Pine III"), 62 Fed. Cl. 635, 648-51 (2004). Precision Pine, however, elected to treat the breaches as partial; it resumed harvesting pursuant to the contracts after the suspensions were lifted and requested contract term adjustments for each contract affected by the suspensions. Precision Pine III, 62 Fed. Cl. at 648-51. The Forest Service granted these requests, extending each contract by the number of days Precision Pine lost during the normal operating season due to the suspensions. Id.

In addition to requesting and receiving contract adjustments, Precision Pine submitted claims for damages resulting from the suspensions to the Forest Service contracting officer. The contracting officer awarded $18,242.78 of the $13 million Precision Pine claimed in damages. Id. at 52.

In 1998, Precision Pine filed this action in the Court of Federal Claims. The complaint alleged that the suspensions breached the Forest Service's implied duty of good faith and fair dealing. Precision Pine V, 81 Fed. Cl. at 243. The Court of Federal Claims agreed. Precision Pine I, 50 Fed. Cl. at 73-74. In granting summary judgment in favor of Precision Pine on liability, the trial court found that the government breached the contracts under three different theories.

For the seven contracts entered into after the <u>Pacific Rivers</u> decision,[3] the trial court held that the Forest Service breached an express warranty created by clause CT 6.25. For these same seven contracts, the trial court also held that the Forest Service breached an implied duty to cooperate. <u>Precision Pine I</u>, 50 Fed. Cl. at 69-70; <u>Precision Pine V</u>, 81 Fed. Cl. at 266-67. The breach of the express warranty and implied duty to cooperate occurred after the Ninth Circuit issued its decision in <u>Pacific Rivers</u>; however, damages from these breaches did not arise until the contracts were suspended in August 1995, pursuant to the Arizona district court's order. <u>Precision Pine V</u>, 81 Fed. Cl. at 267.

For eleven of the contracts,[4] the trial court held that the Forest Service breached the implied duty not to hinder because the length of the suspensions was unreasonable and attributable to the Forest Service's actions. <u>Id.</u> at 70-72; <u>see also</u> <u>Precision Pine V</u>, 81 Fed. Cl. at 266-67. After this determination on liability, the case was assigned to a different judge, who oversaw discovery and conducted a six-week trial on damages.

The trial court determined that Precision Pine was not entitled to damages as a lost volume seller because such damages were too remote and indirect to be recoverable as a matter of law. <u>Precision Pine V</u>, 81 Fed. Cl. at 250. Based on the alternative harvesting and mill schedule devised by the trial court, Precision Pine was awarded $3,343,712 in damages. <u>Precision Pine VI</u>, 81 Fed. Cl. at 740. In arriving at

---

[3] The Mud, Monument, Saginaw-Kennedy, Brann, Manaco, Brookbank and Kettle contracts. <u>Precision Pine I</u>, 50 Fed. Cl. at 73.

[4] The Hay, O.D. Ridge, U-Bar, Jersey Horse, Salt, Mud, Monument, Saginaw-Kennedy, Manaco, Brookbank and Kettle contracts. <u>Precision Pine V</u>, 81 Fed. Cl. at 267.

this figure, the trial court concluded that Precision Pine had proved its losses with reasonable certainty, though it disallowed certain consequential damages. Precision Pine V, 81 Fed. Cl. at 281-83, 294. The trial court refused to reduce the damages award by the amount of losses Precision Pine would have incurred by harvesting roundwood as required under the contracts, concluding that Precision Pine would have been excused by clause BT 6.4 due to "gross economic impractability." Id. at 278-79.

The government now appeals the trial court's findings on liability and damages. Precision Pine cross-appeals the damages award, arguing that it was entitled to increased manufacturing costs (alternately termed "sawmill costs" or "mill inefficiency costs") for all of the breached contracts, not just the Brann contract.[5]

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

On appeal, we must decide whether Precision Pine is entitled to damages resulting from the government's suspension of its fourteen contracts pursuant to the Arizona district court's order in Silver. The answer to this question depends on whether the Court of Federal Claims was correct to hold the government liable for breach of contract.

### I. Liability

The facts relevant to the question of liability are not in dispute, though the conclusions that follow from them are. On appeal, we must decide two issues: First,

---

[5]    In light of our conclusions on liability, we need not reach the other issues Precision Pine raises in its cross-appeal. See Aventis Pharma Deutschland GmbH v. Lupin, Ltd., 499 F.3d 1293, 1303 (Fed. Cir. 2007) (declining to reach a cross-appeal that was moot in light of the opinion's other conclusions).

whether clause CT 6.25 of the timber contracts creates an express warranty; second, whether the government breached the implied duty of good faith and fair dealing.

We review the trial court's grant of summary judgment on liability de novo. <u>Felix v. Am. Honda Motor Co.</u>, 562 F.3d 1167, 1168, 1180-81 (Fed. Cir. 2009). The trial court's liability decision primarily turned on the proper interpretation of the timber contracts, a matter of law. We review this interpretation without deference. <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d 1360, 1368 (Fed. Cir. 2004). In doing so, we apply general rules of contract interpretation, even though the United States is a party to the contracts. <u>Lockheed Martin IR Imaging Sys., Inc. v. West</u>, 108 F.3d 319, 322 (Fed. Cir. 1997). Contract terms are given their plain and ordinary meaning, unless the provisions are ambiguous. <u>Alaska Lumber & Pulp v. Madigan</u>, 2 F.3d 389, 392 (Fed. Cir. 1993).

## A. Express Warranty

On appeal, the main issue is whether CT 6.25 contained any warranty about what the Forest Service had or had not done, prior to drafting and including the protection measures in CT 6.25. In other words, did CT 6.25 expressly or by implication incorporate the statutory requirements of the ESA into the contracts? For the following reasons, we conclude that the answer is no.

CT 6.25, titled "Protection of Habitat of Endangered Species," states that:

Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973 and R-3 Sensitive Plant and Animal Species List are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or as follows:

[Contract-specific measures listed, if any.]

> If protection measures prove inadequate, if other such areas are discovered, or if new species are listed on the Endangered Species List, Forest Service may either cancel under CT8.2 or unilaterally modify this contract or provide additional protection regardless of when such factors become known. Discovery of such areas by either party shall be promptly reported to the other party.
>
> In the event of contract modification under this Subsection, Purchaser [Precision Pine] shall be reimbursed for any additional protection required by the modification, provided that any work or extra protection required shall be subject to prior approval by the Forest Service. Amount of reimbursement shall be determined by the Forest Service using standard Forest Service rate redetermination methods in effect at time of agreed change and shall be in the form of a reduction in Current Contract Rates unless agreed otherwise in writing. However, in no event may Current contract Rates be reduced below Base Rate.

Precision Pine has consistently argued CT 6.25 expressly warrants that the Forest Service complied with the statutory requirements of the ESA and disclosed every "special measure" which the Forest Service knew or should have known. Precision Pine I, 50 Fed. Cl. at 65-66. The government disagrees with this reading, arguing that the plain language of CT 6.25 does not guarantee the Forest Service took any particular actions to assure that the representations in CT 6.25 were accurate or that the list of "special measures" was complete.

The Court of Federal Claims construed CT 6.25 to create an express warranty. Id. According to the trial court, this warranty guaranteed that the Forest Service had identified any "special measures" necessary to comply with the ESA at the time the contracts were entered into, based on an analysis of reasonably available information. Id. at 66-67. The trial court found that the Forest Service breached this express warranty by failing to formally consult about the LRMPs after the Ninth Circuit's decision

in <u>Pacific Rivers</u>, which clarified that the ESA required such consultation.[6]  <u>Id.</u> at 69-70. The trial court then found that the Forest Service misrepresented the accuracy and completeness of the special measures in CT 6.25—because in fact the Forest Service had "no reasonable basis" to know whether those measures were adequate, having failed to follow the procedures required by the ESA.  <u>Id.</u>

We read CT 6.25 differently.  Our analysis begins with the language of the contracts.  The plain language of the contracts, including CT 6.25, does not warrant that the Forest Service followed any particular procedures, or complied with any particular statutory requirements, in devising the "special [protective] measures" listed in CT 6.25. Though CT 6.25 refers to the ESA, this reference is best understood as explaining the source of any special measures, rather than as imposing any particular obligations on the Forest Service.

Nor do we read CT 6.25 to incorporate the requirements of the ESA.  <u>Cf.</u> <u>Smithson v. United States</u>, 847 F.2d 791, 794 (Fed. Cir. 1988).  The language of CT 6.25 alleged to incorporate the requirements of the ESA is:

> Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973 and R-3 Sensitive Plant and Animal Species List are shown on Sale Area Map and identified on the ground.  Measures needed to protect such areas have been included elsewhere in this contract or as follows:  . . . [specific measures stated here].

This language is not sufficient to incorporate the ESA or its implementing regulations into the contracts.  To incorporate material by reference, a contract must use clear and express language of incorporation, which unambiguously communicates

---

[6]    For the Mud, Monument, Saginaw-Kennedy, Brann, Manaco, Brookbank and Kettle contracts.

that the purpose is to incorporate the referenced material, rather than merely acknowledge that the referenced material is relevant to the contract. Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1344-45 (Fed. Cir. 2008); see also 11 Richard A. Lord, Williston on Contracts § 30.25 (4th ed. 1999). Precision Pine's timber contracts use no such language; nothing in CT 6.25, or the contracts more generally, explicitly incorporates the ESA. St. Christopher Assocs. v. United States, 511 F.3d 1376, 1384 (Fed. Cir. 2008); see also S. Cal. Fed. Savings & Loan Ass'n v. United States, 422 F.3d 1319, 1329-30 (Fed. Cir. 2005). As with the contract in Smithson, here the contract's passing reference to the entire corpus of the ESA—itself a complex set of statutory provisions—did not automatically result in "wholesale incorporation" of that statute. 847 F.2d at 794. Had the parties intended to incorporate the ESA, they could have done so expressly, through an integration clause. See Northrop Grumman, 535 F.3d at 1344. In the absence of explicit contract language incorporating the ESA, we decline to create a whole new set of obligations—compliance with the multitude of substantive and procedural requirements comprising the ESA—by mere implication. Cf. St. Christopher, 511 F.3d at 1384.

Our conclusion is consistent with this court's decision in Scott Timber Co. v. United States, which similarly concerned the government's obligations arising out of timber contracts between the Forest Service and a private party, Scott Timber. 333 F.3d 1358, 1360 (Fed. Cir. 2003). Scott Timber held that an identically-worded provision (C6.25) did not create an implied warranty "as to any measures actually taken" by the Forest Service. Id. at 1370. This court also rejected Scott Timber's argument that the Forest Service was liable for misrepresentation because C6.25 expressly gave

the Forest Service authority to cancel or unilaterally modify the contract "to provide additional protection regardless of when such facts become known." In light of this clear language in the contract, this court held that Scott Timber could not have reasonably assumed that no further protective measures would ever be needed in the covered areas. Id. at 1371.

The contracts belonging to Precision Pine give the Forest Service the same authority as the contracts in Scott Timber to cancel or modify, "regardless of when such factors become known." See id. at 1370-71. As this court did in Scott Timber, we conclude that this language in CT 6.25 disclaims any explicit or implicit suggestion that the listed "special measures" are complete, unchanging, or assured to be adequate. Id.; T. Brown Constructors, Inc. v. Pena, 132 F.3d 724, 728-29 (Fed. Cir. 1997) (holding that a claim of misrepresentation requires the contractor to show it "honestly and reasonably relied" on an erroneous representation of a material fact, to its detriment); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667-68 (Fed. Cir. 1992) (holding that a claim of misrepresentation requires the party seeking relief to show it (1) "relied upon such misrepresentation," and (2) "was damaged thereby"). Similarly, the contract's detailed reimbursement scheme, which is triggered by a contract modification, put Precision Pine on notice that the listed protection measures were subject to change, thereby precluding reasonable reliance.

The Supreme Court's decision in Hercules, Inc. v. United States, 516 U.S. 417 (1996), is not to the contrary. Hercules held that the government was not responsible for costs that manufacturers of Agent Orange incurred defending against third-party tort claims, even though those claims were based on a product (Agent Orange) made

according to government-provided specifications.  Id. at 425.  To the extent Hercules

speaks to the type of warranty arising from government-required specifications in a

contract, it holds that the specification identifies what the contractor must do to render

satisfactory performance, not what the government must have done in devising the

contract's specifications.

This case is about the latter, not the former.  Precision Pine is not attempting to

collect damages or avoid responsibility for consequences arising from a defective

specification.  Cf. id. at 424-26; United States v. Spearin, 248 U.S. 132, 136 (1918).  As

in Hercules, we decline to read the contract specification, here CT 6.25, expansively.

516 U.S. at 425.  CT 6.25 did not obligate the government to take any particular steps in

devising the special protection measures.

For these reasons, the trial court erred in construing CT 6.25 to create an

express warranty and holding the Forest Service liable for misrepresentation.[7]  CT 6.25

says nothing about what procedures were or were not used to come up with the listed

protection measures.  To the extent it said anything on the issue, CT 6.25 informed

Precision Pine that the listed measures could not be assumed adequate, as evidenced

by the detailed contingency procedures for canceling or modifying the contract.

## B.  Implied Duty

The issue on appeal is whether the Forest Service breached the implied duty of

good faith and fair dealing, which the trial court also termed the implied duty not to

hinder and the implied duty to cooperate.  To answer that question, we begin by asking

---

[7]     Based on our construction of CT 6.25, the Forest Service did not breach its implied duty to cooperate as to those seven contracts.

whether the suspensions were authorized. We conclude that clause CT 6.01 expressly gave the Forest Service such authority.

CT 6.01 (emphasis added) provides that:

Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of the contracting officer:

> (a) To prevent serious environmental degradation or resource damage that may require contract modification under C8.3 or termination pursuant to C8.2;
>
> (b) To comply with a court order, issued by a court of competent jurisdiction; . . . .

Purchaser agrees that in the event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be: (1) Contract Term Adjustment pursuant to BT8.21, or (2) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

The plain terms of CT 6.01 authorize the Forest Service to "interrupt or delay operations under th[e] contract . . . (b) [t]o comply with a court order." The Forest Service suspended the contracts on August 25, 1995, pursuant to the Arizona district court's order in Silver, which required the Forest Service to "defer or suspend all timber harvest activities [in Region 3] . . . until the required consultation commences." 924 F. Supp. at 989. As this court concluded for an identically-worded provision (C6.01) in Scott Timber, we hold that CT 6.01 gave the Forest Service authority to "unilaterally suspend operations under any contracts with the [CT 6.01] clause." 333 F.3d at 1366.

Because the suspensions were authorized, the only remaining question is whether the Forest Service's actions during the suspensions violated the implied duty of good faith and fair dealing.  The duty of good faith and fair dealing is inherent in every contract.  Restatement (Second) of Contracts § 205.  In essence, this duty requires a party to not interfere with another party's rights under the contract.  Id. at cmt.d.  The United States, no less than any other party, is subject to this covenant.  First Nationwide Bank v. United States, 431 F.3d 1342, 1349 (Fed. Cir. 2005).

The trial court found that Forest Service's actions during the suspension resulted in the suspension being unreasonably long.  Precision Pine I, 50 Fed. Cl. at 70-71.  Specifically, the trial court concluded that the Forest Service hindered the contracts because twelve days elapsed after the Arizona district court's order in Silver before the Forest Service requested formal consultation.  Id. at 70.  The trial court also found the two-month delay that preceded the actual start of formal consultations unreasonable; the Forest Service spent this period formulating and revising its Biological Assessment to include requested information.  Id. at 48.  Finally, the trial court found the Forest Service unreasonably delayed the consultation process by failing to provide a legally sufficient Biological Opinion that conformed to a joint stipulation with the environmental groups in Silver.  Id. at 48-50, 71.  In support of this finding, the trial court cited the Arizona district court, which had reprimanded the Forest Service on several occasions for attempting to resume timber harvesting while the injunction remained in effect.

There is no question that the Forest Service's efforts to resume timber harvesting were premature and in violation of the injunction in Silver.  Not all misbehavior, however, breaches the implied duty of good faith and fair dealing owed to other parties

to a contract.  See First Nationwide, 431 F.3d at 1350 (noting that not all governmental action that affects existing government contracts violates the implied duty of good faith and fair dealing).

Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch. First, the government enters into a contract that awards a significant benefit in exchange for consideration.  Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract.  See, e.g., id. at 1350-51; Centex Corp. v. United States, 395 F.3d 1283, 1304-07 (Fed. Cir. 2005); see also Hercules, 516 U.S. 417.  The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.  Centex, 395 F.3d at 1311.

Centex and First Nationwide are prototypical examples of this modus operandi. In Centex and First Nationwide, various private companies bought failing savings and loan institutions from the government in exchange for significant tax deductions and tax-exempt reimbursements.  First Nationwide, 431 F.3d at 1344-45; Centex, 395 F.3d at 1304-06.  Several years later, Congress enacted remedial, retroactive legislation (the "Guarini Legislation") that disallowed these tax deductions, the effect of which was to deprive the private companies of what was a significant, central benefit of the contract. First Nationwide, 431 F.3d at 1345, 1349-50; Centex, 395 F.3d at 1304-06.  In both cases, this court concluded that the Guarini Legislation was specifically targeted at the

plaintiffs' contract rights, thereby breaching the implied covenant of good faith and fair dealing by eliminating a material part of the consideration. First Nationwide, 431 F.3d at 1345, 1349-50; Centex, 395 F.3d at 1304-06. In concluding that the legislation was targeted, this court emphasized that the statute: specifically addressed a small number of transactions, was sought by the Internal Revenue Service for the purpose of eliminating the precise benefit contracted for, not part of a broader changing in the Tax Code affecting taxpayers generally, and "sole[ly] impact[ed]" these contracts. Centex, 395 F.3d at 1305-06.

There are no similar indicia of a governmental bait-and-switch or double crossing at work here. We conclude that there was no breach of the government's implied duty of good faith and fair dealing because the Forest Service's actions during these formal consultations were (1) not "specifically targeted," and (2) did not reappropriate any "benefit" guaranteed by the contracts, since the contracts contained no guarantee that the Precision Pine's performance would proceed uninterrupted. Cf. id. at 1306.

The Forest Service's actions are not akin to the "specifically targeted" government action in First Nationwide, Centex, or Hercules. In those cases, the subsequent government action was for the specific purpose of eliminating an express, bargained-for benefit in the contracts and "sole[ly] impact[ed]" these contracts. Hercules, 516 U.S. at 870; First Nationwide, 431 F.3d at 1350-51; Centex, 395 F.3d at 1305-07. Here, there is no evidence that the Forest Service's slight delay in initiating formal consultations, or its initially unsuccessful attempts to formulate a satisfactory Biological Opinion, were undertaken for the purpose of delaying or hampering Precision

Pine's contracts. Nor is there any evidence of bad faith or a failure to cooperate with Precision Pine. Cf. Centex, 395 F.3d at 1304-06; Malone, 849 F.2d at 1445-46.

There is evidence that the Forest Service failed to cooperate, but that failure was in the context of the Silver litigation and the Forest Service's consultations with the Fish and Wildlife Service. Because liability only attaches if the government action "specifically targeted" a benefit of Precision Pine's contract, how the delay arose is not only relevant, but dispositive here. Though Precision Pine was unquestionably affected by the Silver litigation, it was not a party to that suit or the formal consultations. Accordingly, the fact the Forest Service violated its obligations under the ESA to the Fish and Wildlife Service, an unrelated third party, does not mean the Forest Service violated its duties to Precision Pine under the timber contracts, to whom these statutory duties were not owed. See Agredano v. United States, ___ F.3d ___, Nos. 2008-5114, -5115, 2010 WL 537160, at *2-3 (Fed. Cir. Feb.17, 2010); Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1365 (Fed. Cir. 2009); supra Part I.A. Similarly, the incidental effect on Precision Pine's contracts that resulted from the Forest Service's statutory obligations under the ESA did not, without more, violate the duty of good faith and fair dealing owed to Precision Pine.

In addition to the lack of "specifically targeted" government action, the Forest Service's actions did not breach its implied duty of good faith and fair dealing because uninterrupted contract performance following an ESA listing decision was not a "benefit" guaranteed by the contracts. Although the implied duty of good faith and fair dealing attaches to every contract, what that duty entails depends in part on what that contract promises (or disclaims). Accordingly, we examine what the contracts say and the

circumstances of this case.  See Hercules, 516 U.S. at 424-25 (explaining that a party asserting an implied warranty "must establish that, based on the circumstances at the time of contracting, there was an implied agreement between the parties to provide the undertakings the petitioners allege"); Centex, 395 F.3d at 1305-07.

The valuable benefit Precision Pine bargained for was the right to harvest timber in a certain place, at a certain time.  Significantly, however, the contracts expressly qualified that benefit.  See Agredano, 2010 WL 537160, at *2-3 (holding there was no implied warranty when such a warranty was expressly disclaimed).  For our purposes, the relevant qualification is in the provisions that provide for the situation which arose here—the listing of a new species and delays associated with reassessing Forest Service projects.  Under CT 6.01, Precision Pine "agree[d] to interrupt or delay operations under this contract, in whole or in part," to prevent serious environmental degradation or to comply with a court order, such as the injunction in Silver.  Similarly, CT 6.25 allowed the Forest Service to modify or cancel the contracts in order to comply with the ESA.  Unlike the contracts at issue in Centex and First Nationwide, Precision Pine's contracts did not promise or guarantee uninterrupted performance following a listing decision; the plain language of the contracts state their provisions may be modified, suspended, or even canceled to comply with the ESA.  If anything, CT 6.01 and CT 6.25 expressly contemplate and allow the Forest Service to interfere with Precision Pine's performance.  Cf. Centex, 395 F.3d at 1304-06.

The implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.  Id. at 1304-06; see also Agredano, 2010 WL 537160, at

*2-3. In these contracts, CT 6.01 and CT 6.25 make clear that one "benefit" the parties did not contemplate, and which Precision Pine is thus not entitled to under the contracts, is the guarantee of uninterrupted performance. Cf. id. (noting that the benefit eliminated by subsequent government action was an "important part of the contract consideration" and one "they reasonably expected the government not to withhold"). Because Precision Pine had no reasonable expectation that its contracts would be unaffected by the listing of a new species like the Mexican spotted owl, the Forest Service's actions did not destroy Precision Pine's reasonable expectations under the contract. Id. at 1304; see also Restatement (Second) of Contracts § 205.

## II. Damages: the Hay contract

For the reasons stated above, the Forest Service did not breach any express warranty or implied duties associated with Precision Pine's contracts. Accordingly, Precision Pine is not entitled to damages flowing from the suspension of any of the contracts except the Hay contract. The Hay contract lacks CT 6.01, as well as any equivalent provision giving the Forest Service suspension authority. See supra Part I.B. As the government concedes, the Forest Service breached the Hay contract on August 25, 1995, by suspending it to comply with the injunction in Silver. Precision Pine I, 50 Fed. Cl. at 46. That, however, is not the end of the matter. The real question is how much money Precision Pine should receive in compensation for that breach.

On appeal, the government challenges the trial court's damage calculations on several grounds. First, the government argues that the methodology chosen by the trial court to calculate damages is not supported by substantial evidence. Second, the government argues that the trial court should have reduced the damages award by the

losses Precision Pine would have sustained from harvesting roundwood, as required by the contract terms. In its cross-appeal, Precision Pine argues that it was entitled to manufacturing costs (also termed "mill inefficiency" or "sawmill costs").

At trial, Precision Pine sought to recover lost profits it claimed would have been earned from the sale of lumber and lumber by-products, had Precision Pine been able to harvest timber during the suspension period. Precision Pine & Timber v. United States ("Precision Pine IV"), 72 Fed. Cl. 460, 464-65 (Ct. Cl. 2006). During a six-week bench trial on damages, the trial court received extensive documentary evidence and heard testimony from numerous witnesses. To estimate lost profits, Precision Pine's damage expert, Mr. Robert Ness, attempted to determine what Precision Pine's total revenues would have been from timber harvested under the contracts during the suspension period, less direct costs for harvesting the timber and manufacturing it into lumber and lumber by-products. Id. at 465. The first step in Ness's methodology was to determine how much timber Precision Pine would have harvested in the absence of a breach. To estimate the amount of timber, Ness relied on a "reconstructed" timber harvesting schedule that Precision Pine's president, Mr. Lorin Porter, testified his company would have followed. Id. at 261. Using several different conversion factors, Ness then estimated the volume of lumber products Precision Pine could have produced from the timber. Id. at 261-62.

In calculating the damages award, the trial court did not fully credit the methodology used by Precision Pine's damages expert. Precision Pine V, 81 Fed. Cl. at 268-71; see also Precision Pine VI, 81 Fed. Cl. at 735. Specifically, the trial court found that Precision Pine would not have followed the specific harvesting schedule on

which Ness's calculations were based. Precision Pine V, 81 Fed. Cl. at 268. Although Precision Pine failed to carry its burden of proof with respect to the precise harvesting schedule, the trial court nevertheless found Precision Pine showed it sustained damages as a direct and foreseeable result of the Forest Service's breach. Id. Based on its review of the evidence, the trial court constructed its own alternative harvesting schedule, which it then used to calculate damages. Id. at 268-71.

The trial court did not reduce the damages award by the losses Precision Pine would have sustained for harvesting and disposing of roundwood, trees that are less than nine inches in diameter. Id. at 278-79. Instead, the trial court concluded that removal of roundwood would have been excused under clause BT 6.4 of the contracts, due to "gross economic impracticability." The court based this conclusion on evidence that Precision Pine would have had effectively no market for the roundwood, which would have caused it to suffer losses from roundwood harvesting that exceeded its average net profits per year.

Also relevant to this appeal is the trial court's conclusion that Precision Pine was not entitled to recover manufacturing costs on the Hay contract. Precision Pine presented evidence that the Forest Service's breach caused it to suffer losses due to the lower volume and quality of logs its mills processed. Id. at 291-92. The trial court concluded that such manufacturing costs were too remote and consequential, because the costs were associated with milling timber from other, collateral contracts not at issue in this suit. Id.

To the extent these contentions are relevant to the proper measure of damages for the Hay contract, we address them below.

A.  Sufficiency of the Evidence

The government challenges the damages award on two grounds.  First, the government argues that Precision Pine failed to prove damages with reasonable certainty.  Second, the government argues that the trial court abused its discretion by ordering supplemental briefing and then awarding damages based on those filings, rather than reopening the case for additional testimony and argument.

For the following reasons, we conclude that the trial court's damage calculations were supported by substantial evidence.  We further hold that the trial court did not abuse its discretion in refusing to reopen the record.

Whether Precision Pine proved damages for the Hay contract with "reasonable certainty" really reduces to a question of what Precision Pine was required to prove. The government argues that the trial court was limited to two stark choices:  accept Precision Pine's damage calculations in their entirety, or enter judgment for the United States.  We cannot agree that the trial court's options were so limited.

In a bench trial, such as the one conducted below, the trial court sits as both judge and jury.  As the jury, the trial court weighs the evidence and reaches a verdict.  A major difference between verdicts rendered by a judge and by a jury is what we know on appeal.  In a contract case, a typical jury verdict is a "yes" or "no" to liability, accompanied by a handwritten figure for damages.  A judge frequently says more, explaining why he found a party liable (or not) and how any damages award was calculated.  See Fed. R. Civ. P. 52(a).  The fact that a judge says more, however, does not alter that judge's discretion to weigh the evidence or our standard of review.  See, e.g., Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1171-72 (Fed. Cir. 2006); Gjerlov

v. Schuyler Labs., Inc., 131 F.3d 1016, 1019 (Fed. Cir. 1997); see also Golden Blount, Inc. v. Robert H. Peterson Co., 438 F.3d 1354, 1359 (Fed. Cir. 2006). As the fact finder in the bench trial, the judge is responsible for deciding what evidence to credit or reject and what result to reach. Just as a jury may find for a party without believing everything that party's witnesses say, a judge may award damages, even if he does not fully credit that party's methodology. On appeal, the question with respect to damages is whether the evidence adduced at trial was sufficient to enable the fact finder (judge or jury) to make a "fair and reasonable approximation." Nat'l Australia Bank v. United States, 452 F.3d 1321, 1327 (Fed. Cir. 2006). In other words, the party seeking damages has the burden of proving them with "reasonable certainty." As the phrase itself suggests, reasonable certainty requires more than a guess, but less than absolute exactness or mathematical precision. Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001).

We conclude that substantial evidence supported the award of damages on the Hay contract, even though the trial court based the award on a timber harvesting schedule of its own design, rather than the schedules offered by either party. It was proper for the trial court to resolve conflicting testimony by weighing the evidence and making its own findings. See Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."); Ecolochem, Inc. v. S. Cal. Edison Co., 227 F.3d 1361, 1378-79 (Fed. Cir. 2000) (giving "great deference" to the trial court's decisions regarding the credibility of witnesses and weight accorded to different evidence). The trial court did

not abuse its discretion by modifying Precision Pine's methodology for calculating damages, particularly since those modifications minimized the effects of uncertainty and arbitrary assumptions on the damages award. Cf. LaSalle Talman Bank, F.S.B. v. United States, 462 F.3d 1331, 1336-37 (Fed. Cir. 2006) (holding that the trial court's modified methodology for calculating damages was not an abuse of discretion). The record reflects that the trial court carefully weighed the evidence, providing well-reasoned explanations for its assumptions and why it credited particular evidence. Precision Pine V, 81 Fed. Cl. at 268-77.

We similarly conclude that the trial court did not abuse its discretion in refusing to reopen the record. See Fed. R. Civ. P. 52(b), 59(a)(2); Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362 (Fed. Cir. 1999) (reviewing denial of motion to reopen the record for abuse of discretion). Though a trial court "may" reopen a judgment after a bench trial to take additional evidence or amend its findings, the decision to do so rests within the sound discretion of the trial court. Fed. R. Civ. P. 59(a)(2). Here, the trial court did not abuse its discretion in denying the government's motion to reopen, considering the probative value of the evidence proffered, the explanation for why it was not offered earlier, and the likelihood of undue prejudice. We agree that these factors weigh against the government. The "new" damages evidence the government sought to dispute was not actually new, but simply Precision Pine's mathematical calculations using evidence already presented and tested at trial. Precision Pine VI, 81 Fed. Cl at 735. The government's proffered evidence largely restated its early objections to the damage calculations, without providing an explanation for why those opinions were not offered earlier. To the extent the computations themselves were "new," the government

had a full and fair opportunity to dispute them in its response to Precision Pine's post-trial brief.

## B. Roundwood Losses

The parties stipulated that there was "no roundwood to be harvested on the Hay timber sale contract." Thus, Precision Pine would not have sustained any losses on the Hay contract from harvesting roundwood, even if the trial court had not found such harvesting excused by clause BT 6.4. Because the proper construction of BT 6.4 is thus irrelevant to calculating any damages owed on the Hay contract, we do not decide whether BT 6.4 excuses roundwood removal for gross economic impracticability.

## C. (Cross-Appeal) Manufacturing Costs

In its cross-appeal, Precision Pine challenges the trial court's denial of "mill inefficiency costs" allegedly flowing from suspension of the Hay contract.[8] Though Precision Pine calls these expenses "mill inefficiency costs" or "increased manufacturing costs," these names are misnomers. The "losses" claimed are actually the fixed costs of operating Precision Pine's sawmills—namely, the cost of labor, taxes, and insurance. Precision Pine's expert opined that the Forest Service's breach increased these costs (which, of course, could not really increase because they are, by nature, fixed) because the cost of manufacturing a certain volume of timber (1000 board feet) increased. Precision Pine V, 81 Fed. Cl. at 291-92. As this court held in Scott Timber, we conclude that these fixed costs were not directly related to the Hay contract and not a direct result of the suspension. 333 F.3d at 1371-72; see also Wells Fargo Bank, N.A. v. United

---

[8] In its opinion, the trial court referred to these expenses as "mill inefficiency costs." Precision Pine V, 81 Fed. Cl. at 291.

<u>States</u>, 88 F.3d 1012, 1021 (Fed. Cir. 1996) (holding that remote and consequential damages are not recoverable). While the cost <u>per board</u> "increased," there was no actual change in the underlying cost of operating the sawmills; Precision Pine would have had to bear the costs of its sawmill operations regardless of whether the Forest Service breached the contracts.

Accordingly, the trial court properly denied Precision Pine's claims for manufacturing costs on the Hay contract.

## CONCLUSION

For the foregoing reasons, we conclude that CT 6.25 did not create an express warranty and the Forest Service did not breach its implied duty of good faith and fair dealing. We accordingly reverse the trial court's judgment of liability and vacate the damages award on all contracts except the Hay contract. Because the Forest Service lacked authority to suspend it, we affirm the liability finding on the Hay contract. Precision Pine is entitled to damages on the Hay contract from the date of the Forest Service's breach in August 1995, until the suspension was lifted in December 1996. On remand, the trial court should award damages on the Hay contract consistent with this opinion. For the remaining thirteen contracts, the trial court should enter judgment for the United States.

## COSTS

Each party shall bear its own costs.

<u>AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED</u>