# United States Court of Appeals
## for the Federal Circuit

---

**SOUTHERN CALIFORNIA EDISON COMPANY,**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2010-5147

---

Appeal from the United States Court of Federal Claims in case no. 04-CV-109, Judge Lawrence M. Baskir.

---

DECIDED: August 23, 2011

---

BRAD FAGG, Morgan, Lewis & Bockius LLP, of Washington, DC, argued for plaintiff-appellee.

ANDREW P. AVERBACH, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant- appellant. On the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, HAROLD D. LESTER, JR., Assistant Director, and LISA L. DONAHUE, Trial Attorney. Of counsel on the brief was JANE K.

TAYLOR, Attorney, Office of General Counsel, United States Department of Energy, of Washington, DC.

---

Before LOURIE, PLAGER, and DYK, *Circuit Judges.*

PLAGER, *Circuit Judge.*

In this, another of the spent nuclear fuels cases, the United States ("Government") had contracted to dispose of plaintiff's spent nuclear fuel and related wastes; as in the other cases, the contract continues to be breached because the United States has yet to perform. The only issue before us is the measure of damages, specifically, whether certain indirect overhead costs incurred by plaintiff can be included in plaintiff's damages calculations. The United States Court of Federal Claims ("Court of Federal Claims") concluded that such indirect costs are includable. The Government appeals. Because the trial court did not err in its conclusion, we affirm.

BACKGROUND

In 1983, Congress enacted the Nuclear Waste Policy Act ("NWPA"), which authorized the Secretary of Energy to enter into contracts with nuclear plant utilities, the generators of spent nuclear fuel ("SNF") and high-level radioactive waste ("HWL"). The Act provided that the Government would accept and dispose of the utilities' nuclear waste in return for the generators paying into a Nuclear Waste Fund. *See* Nuclear Waste Policy Act of 1982 § 302, 42 U.S.C. § 10131. In June 1983, pursuant to its authority, the Department of Energy ("DOE") entered into a contract, what became known as the Standard Contract, with Southern California Edison ("SCE") for the acceptance of SNF and HLW produced at SCE's San Onofre Nuclear Generating Station ("SONGS"). Where

exactly the Government intended to dispose of these wastes became a controversial issue; in 1987, Congress amended the NWPA to specify that the repository for storing these nuclear wastes would be located in Yucca Mountain, Nevada. 42 U.S.C. § 10172(a)-(b).

DOE has yet to accept spent fuel from SONGS. Despite the 1987 amendment, the question of where and how the Government will dispose of the wastes remains unanswered to this date. The Government's current estimate is that it will not begin accepting the waste until 2020, if at all. *See S. Cal. Edison v. United States*, 93 Fed. Cl. 337, 341-42 (2010).

In 2010, the Secretary of Energy, at the direction of the President, established The Blue Ribbon Commission on America's Nuclear Future. The Commission's charge was to conduct a comprehensive review of policies for managing the back end of the nuclear fuel cycle. *See Presidential Memorandum of Jan. 29, 2010—Blue Ribbon Commission on America's Nuclear Future*, 75 Fed. Reg. 5485 (Feb. 3, 2010). The Commission has just released its report: "[t]he overall record of the U.S. nuclear waste program has been one of broken promises and unmet commitments." *Blue Ribbon Commission on America's Nuclear Future Draft Report to the Secretary of Energy*, Blue Ribbon Commission on America's Nuclear Future, July 29, 2011, at xiv, *available at* http://www.brc.gov. The Commission further concluded that the recent "decision to suspend work on the [Yucca] repository has left . . . [states and communities across the United States] wondering, not for the first time, if the federal government will ever deliver on its promises." *Id.* at 25; *see also* Mark Maremont, *Nuclear Waste Piles Up—in Budget Deficit*, Wall St. J., Aug. 9, 2011, at A3 (describing the current

and projected federal liabilities associated with the Government's promise to dispose of the SNF).

Against this backdrop, it is hardly surprising that in 2001, SCE began constructing dry storage facilities, known as the Independent Spent Fuel Storage Installation ("ISFSI"), for its SONGS-produced nuclear waste. *S. Cal. Edison*, 93 Fed. Cl. at 346. SCE created its ISFSI facilities to provide on-site storage for part of its SNF rather than to continue using an outside company. *Id.* Following the construction of the first ISFSI facility, SCE filed a complaint in the Court of Federal Claims seeking damages from the United States as a result of DOE's breach of the Standard Contract. SCE requested damages in the following categories:

- costs of constructing and operating the ISFSI facilities;
- overhead allocated to the ISFSI project;
- off-site storage of SNF; and
- costs associated with SCE's participation in a limited liabilities corporation with other nuclear utilities known as the Private Fuel Storage project.

*Id.* The trial court conducted a six-day trial and awarded $142,394,294 to SCE for expenses undertaken because of DOE's breach. *Id.* at 340. Of that amount, $23,657,791 was attributable to indirect overhead costs associated with the ISFSI project. *Id.* at 371.

The indirect overhead costs claimed by SCE were separated into three categories: (1) Common Allocation; (2) Corporate Administrative and General ("A&G"); and (3) Internal Market Mechanism. *Id.* at 356-57. The Common Allocation costs included items such as plant security, emergency response systems, lease payments, regulatory fees, and costs associated with SCE's compli-

ance with certain environmental requirements. *Id.* at 356. The Corporate A&G costs related to salaries, bonuses, and the management of SCE's physical properties. *Id.* at 357. Lastly, the Internal Market Mechanism costs related to labor, materials, and services for the internal management of SCE's corporate real estate divisions and its mechanical shop. *Id.*

At trial, the Government did not contest the accuracy of the overhead costs presented by SCE, but instead argued that overhead costs were an improper measure of SCE's damages. *Id.* at 356-58. The trial court disagreed with the Government, concluding that the construction of the ISFSI facilities was "a necessary and integral part of SCE's overall operations" and "[c]onsequently, it draws on the company's resources, whether they be payroll services, insurance, or a host of other general expenses which represent the cost of doing business." *Id.* at 358. The trial court further found that "[h]ad the Government not created the need for temporary dry storage at the plant, SCE could have allocated its resources to other projects." *Id.* at 359. The court concluded that the indirect overhead costs properly constituted an element in SCE's damages. *Id.* The Government timely appealed the trial court's determination regarding the indirect overhead costs.[1] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review the Court of Federal Claims judgments "to determine if they are incorrect as a matter of law or premised on clearly erroneous factual determinations."

---

[1] The Government has not appealed the other damages amounts awarded by the Court of Federal Claims.

*Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1171 (Fed. Cir. 1991). Legal conclusions by the Court of Federal Claims are reviewed without deference. *Dehne v. United States*, 970 F.2d 890, 892 (Fed. Cir. 1992).

Recently, this court had occasion to consider, in connection with these spent nuclear fuel cases, whether it is proper to award overhead costs associated with the breach of the Standard Contract. *See Energy Nw. v. United States*, 641 F.3d 1300, 1308-10 (Fed. Cir. 2011) (affirming the trial court's award of overhead damages). We concluded that "[s]o long as the plaintiff can present a sufficient basis for making the trial court reasonably certain that the claimed damages were caused by the breach, whatever the proof method, we will defer to that finding in the absence of clear error." *Id.* at 1310. Here, witnesses from both sides, including expert witnesses, testified to SCE's accounting procedures and the manner in which the overhead costs were allocated to the ISFSI project. The trial court found that none of the evidence "exposed any significant concerns with the reliability or accuracy of the accounting methods used" and, therefore, "accept[ed] the quantum of the various [overhead] costs incurred by SCE." *S. Cal. Edison*, 93 Fed. Cl. at 356.

The Government does not contest the existence of the claimed overhead expenses, nor does it contest that SCE's general overhead expenses increased because of the Government's breach. Instead, the Government argues that SCE failed to meet its burden of separating out the overhead costs caused by the breach from those unrelated to the breach. *See Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1273 (Fed. Cir. 2008) (requiring that the plaintiffs in breach of contract suits present sufficient evidence for the court to perform a comparison between the breach and non-breach worlds in order to

accurately assess damages). Relying upon our decision in *Carolina Power & Light Co. v. United States*, 573 F.3d 1271 (Fed. Cir. 2009), the trial court found that it was proper for SCE to allocate the indirect overhead costs to the ISFSI project on a percentage basis because if it had not, "other projects and SCE operations [would] support an unequal share of the overhead costs." *S. Cal. Edison*, 93 Fed. Cl. at 359. Further, the court found that the overhead costs were causally linked to the breach because if "the Government had not created the need for temporary dry storage at the plant, SCE could have allocated its resources to other projects." *Id.* (internal citations omitted). We find no error in the trial court's determination that SCE's overhead expenses were linked to the breach and therefore are recoverable; we defer to that finding as required by our precedent.

The Government further argues that because the trial court found that most of the indirect overhead costs "are of the type that had been incurred prior to the breach and would be incurred as a result of normal operations at SONGS irrespective of the breach," the costs are necessarily unrecoverable. *Id.* at 356. To reach this conclusion, the Government relies on our opinion in *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010), in which we upheld the trial court's decision not to award damages for all the proposed overhead costs.

But such reliance is misplaced. In *Precision Pine*, the United States Forest Service entered into fourteen contracts that required the plaintiff to cut and remove specified timber. 596 F.3d at 821. Subsequently, the Mexican spotted owl that resided in the affected woods was placed on the endangered species list. This led to the suspension of the plaintiff's contracts. *Id.* at 822. The plaintiff viewed the suspensions as a partial breach of contract and

sought to recover damages flowing from the suspensions. We concluded that in all but one of the contracts, the suspensions were authorized and the Government did not violate the implied duty of good faith and fair dealing. *Id.* at 828-31. In the one remaining contract, however, we found that the contract did not contain a provision authorizing the suspension; damages were due. The plaintiff was not, however, entitled to the full amount of overhead damages that it requested because several of the costs were fixed costs associated with operating the sawmills, whose existence did not depend on the Government contracts. *Id.* at 834. Specifically, we found that, while the costs per item produced by the sawmill increased due to the breach, "there was no actual change in the underlying cost of operating the sawmills." *Id.*

In this case, the Government's breach of the Standard Contract caused SCE to build, staff, and maintain an entirely new facility for SNF storage. SCE specifically constructed the ISFSI facilities to mitigate the Government's breach. Because the ISFSI facilities had not existed prior to the Government's breach, and indeed were necessitated by the breach, this is not a case where the underlying costs were incurred by operations independent of and unrelated to the breach.

CONCLUSION

The judgment of the Court of Federal Claims is affirmed.

**AFFIRMED**