ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Langdon Engineering & Mgt | )  ASBCA Nos. 61959, 63501 |
| | ) |
| Under Contract No. N00244-15-P-0294 | ) |

APPEARANCE FOR THE APPELLANT:    Mr. Albert L. Swank, Jr.
                                    President

APPEARANCES FOR THE GOVERNMENT:    Allison M. McDade, Esq.
                                    Navy Chief Trial Attorney
                                   Elizabeth C. Tosh, Esq.
                                   Jerry Kim, Esq.
                                   Russell A. Shultis, Esq.
                                    Trial Attorneys

<u>OPINION BY ADMINISTRATIVE JUDGE WOODROW</u>

This appeal involves the Navy's termination for default of a firm fixed-price contract with Langdon Engineering & Management (Langdon) to refurbish and deliver eight bow thruster nozzles used to propel a type of hovercraft known as Landing Craft Air Cushion (LCAC). The Navy terminated Langdon's contract for cause because Langdon failed to refurbish or deliver any of the bow thruster nozzles. Langdon appealed that termination (ASBCA No. 61959) and also submitted a monetary claim seeking $730,000 (ASBCA No. 63501).

Langdon's owner, Mr. Albert L. Swank, Jr., who is not an attorney, represented appellant on a *pro se* basis. Despite his lack of any formal training, Mr. Swank ably and thoroughly made arguments and presented evidence throughout the hearing.

On March 2, 2021, the Board denied the Navy's motion for summary judgment on the grounds that there was a material dispute of fact concerning whether the bow thrusters provided by the Navy differed materially from the OEM drawings and therefore could not be refurbished as required by the contract. *Langdon Eng'g & Mgt.*, ASBCA No. 61959, 21-1 BCA ¶ 37,810 at 183,623.

On March 9, 2023, the Board conducted a hearing via videoconference on both entitlement and quantum. The hearing took place over four days, with the first two days being held on March 9-10, 2023, and the final two days on March 29-30, 2023. Following the hearing, both parties filed post-hearing briefs and reply briefs. With its post-hearing brief, Langdon submitted additional documents purporting to support its

quantum claim. However, Langdon did not previously include these documents in its Rule 4 file, nor did it proffer the documents during the hearing.

As set forth below, we uphold the government's termination for cause and deny the appeal (ASBCA No. 61959). We also deny Langdon's appeal seeking monetary damages (ASBCA No. 63501).

<u>FINDINGS OF FACT</u>

**I. The Contract**

1. On May 22, 2015, the Navy (though the Naval Supply Systems Command, Fleet Logistics Center, San Diego), awarded Contract No. N00244-15-P-0294 to Langdon for the complete refurbishment of eight bow thruster nozzles used on air cushion landing craft (ASBCA No. 61959 (61959) R4, tab 1 at 1-3). In exchange for a firm-fixed-price of $77,295.28, Langdon agreed to refurbish the bow thruster nozzles as well as install eight new bow thruster bearings which the Navy had provided as Government Furnished Material (*id.* at 3).

2. On May 26, 2015, shortly after the contracting officer (CO) awarded the contract to Langdon, Mr. Swank emailed a representative of L-3 Unidyne, Inc. seeking a quote for the refurbishment of the eight bow thruster nozzles under the contract. The representative for L-3 Unidyne replied on the same date that he would respond to Mr. Swank's request and that L-3 Unidyne had performed repairs and upgrades on an LCAC craft, including the refurbishment of the bow thruster nozzles. (App. supp. R4, tab 19.038)

3. The LCAC landing crafts are amphibious vehicles used to transport Marine personnel and equipment from ship to shore (tr. 2/7-8). The eight craft at issue here were manufactured in the 1980's and 1990's and were approximately 20-25 years old when the contract was awarded (tr. 2/7-8; 3/135).

4. Bow thrusters nozzles are used to steer the landing craft by directing high velocity air out of the nozzle. A bow thruster nozzle is a "fiberglass duct mounted vertically on the bow thruster bearing" (61959 R4, tab 254 at 1338). It rotates on the bearing and pushes "high-velocity air produced by the lift fans out through an elliptical exhaust nozzle that creates a venturi effect on the high-velocity air leaving the thruster" (*id.* at 1321. By directing air, the bow thruster controls the bow of the craft and steers the landing craft (tr. 2/10). Each landing craft has two bow thruster nozzles—referred to as a ship set—which can be rotated 360 degrees by the craft controller (tr. 2/13, 19, 135).

5.  There are two fiberglass turning vanes connected horizontally to the inner walls of the bow thruster as well as three vertically mounted structural fiberglass reinforcements called "splitters" bisecting the turning vanes. The vanes channel the air flow through the thruster while the splitters strengthen and reinforce the thruster walls and turning vanes.  (61959 R4, tabs 18 at 96, 254 at 1338)

6.  The contract included a statement of work, dated February 20, 2015, that described the performance requirements.  It was divided into seven sections, including 1.0 Introduction, 2.0 Background, 3.0 General Requirements, 4.0 Performance Requirements, 5.0 Deliverables, 6.0 Special Requirements, and 7.0 Point of Contact (61959 R4, tab 1 at 3-4).

7.  Section 2.0 Background of the statement of work stated:

> Due to the cumulative effects of saltwater/ultraviolet/sandblast exposure, the Bow Thruster Nozzles have reached/exceeded the intended service-life. These Bow Thruster Nozzles require complete refurbishment to provide an addition 10-20yrs of service-life. The Bow Thruster Nozzle (BTN) is made up of a painted fiberglass structure with mechanically fastened drive and attachment components; the compositions of all parts are detailed in the reference drawings and technical manual listed in section 4.0.

(61959 R4, tab 1 at 3)

8.  Section 3.0 General Requirements provided that:

> 3.1 Each shipset of BTNs will be completely disassembled with all mechanically fastened components removed and glass bead blasted clean then visually inspected for damage.
> 3.2 Any damaged components will be repaired or replaced. All fasteners (nuts, bolts, washers, screws, etc..) will be replaced with new.
> 3.3 All existing paint on the fiberglass structure will be removed. Any damaged, deteriorated or missing fiberglass will be repaired/renewed/installed ensuring all reference [drawing] dimensions are maintained.

3.4 All new paint and marking will be applied after repairs are complete.

(61959 R4, tab 1 at 3)

9. Section 4.0 Performance Requirements provided that "[a]ll repair material and physical, dimensional, and functional requirements are to be IAW the following reference drawings unless specifically addressed in section 6.0."  The drawings referenced in Section 4.0 were from the original equipment manufacturer (OEM):

4.1 Drawing. 5749810 Rev. R LCAC Mechanical Installation Bow Thruster
4.2 Drawing. 5749544 Rev. V LCAC Bow Thruster
4.3 Drawing. 5749793 Rev. N LCAC Bearing Bow Thruster
4.4 Drawing. 7616123 Rev. B SLEP Mod Bow Thruster
4.5 Drawing. 6800343 Rev. N LCAC Painting and Marking
4.6 Drawing. 5749811 Rev. L LCAC Bracket Support Bow Thruster Installation
4.7 Technical Manual S9568-AL-SLP-010 Rev. 02 Bow Thruster Assembly

(61959 R4, tab 1 at 4).

10. Section 5.0 Deliverables stated the following:  "Four shipsets (8 each) BTNs will be picked up from Assault Craft Unit Five, fully refurbished IAW sections 4.0 and 6.0 and returned to Assault Craft Unit Five.  Period of performance will not exceed 180 days from pickup.  No work will be done at Assault Craft Unit Five" (*id.*).

11. Section 6.0 Special Requirements stated:

6.1 After refurbishment of the BTN is complete; install new GFM Bow Thruster Bearing in accordance with the reference technical manual listed in item 4.6 and mechanical installation [drawing] in item 4.1. The old bearing will be disposed of.
6.2 On a company letterhead work record sheet; record the serial number of the bearing as well as the bearing rotational force figures once installed on the nozzle. Record all fastener types and torque values. A copy of this work record sheet will be attached/provided with each refurbished BTN.

6.3 Fabricate and install new [part number] 479811-043 Seal Ring on each BTN with all new shims and fasteners.
6.4 On each Trunion Plate [part number] 5749544-007 metal stamp in ¼" the vendor name, the contract number under which this refurbishment was awarded, and the date the work was complete.
6.5 As part of this refurbishment; all BTN turning vanes not already modified IAW reference item 4.4 will be so modified.
6.6 Particular attention to the thickness and number of fiberglass layers listed in reference item 4.2 is required and [sic] well as wet assembly requirements for all components and fasteners.
6.7 All existing aluminum angles [part number] 5749544-015 and -019 will be discarded and new angles fabricated from CRES304 or CRES316 sheet, .080"min, .100"max thickness to the same drawing dimensions.
6.8 Each refurbished BTN will be delivered to Assault Craft Unit Five mounted to a pallet and encased in shrink sealed .004"min plastic sheet.
6.9 Each delivered BTN will be marked on the shrink sealed plastic in permanent marker ink with the following: "Bow Thruster Nozzle P/N 5749544-01". Additionally the vendor name, contract number and delivery date will also be marked on shrink seal plastic.

(61959 R4, tab 1 at 4)

12. The total firm-fixed contract price included the shipping of the bow thruster nozzles to and from Assault Craft Unit 5 (ACU-5) at Marine Corps Base Camp Pendleton (61959 R4, tab 1 at 3-5; tr. 1/30-31). ACU-5 is a Navy command that operates and maintains air cushion landing craft (tr. 2/7). The delivery date for all bow thruster nozzles was November 25, 2015. (61959 R4, tab 1 at 5; app. supp. R4, tab 19.078 at 177). Langdon was required to arrange a pickup of the bow thruster nozzles from Camp Pendleton and perform work at its facilities.

13. The contract incorporated, by reference, Federal Acquisition Regulation (FAR) clause 52.212-4, Contract Terms and Conditions – Commercial Items (DEC 2014), which stated, in relevant part:

(f) Excusable delays. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and

5

without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

…

(m) Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

(61959 R4, tab 1 at 6)

14. Modification No. 001 revised the delivery date from November 25, 2015 to October 3, 2016, because of "Government and contractor delays." Specifically, the Navy did not provide the contractor with the drawings required to refurbish the "bow thrusters" in accordance with the SOW. The remaining delay was due to the contractor's problem with its supplier's long lead time for parts. (61959 R4, tab 2 at 23)

15. Modification No. 003 again revised the delivery dates, this time based upon Langdon's requested delivery schedule. The new delivery dates were October 20, 2017, for the first two bow thrusters, January 11, 2018 for the next four, and March 15, 2018 for the remaining two. (61959 R4, tab 3 at 27)

## II. Key Witnesses

16. Appellant's representative in these appeals, Mr. Albert Swank, Jr., is an engineer and the owner of Langdon (tr. 1/16-17). He testified that Langdon did not take any written exceptions to the statement of work (SOW) that was in the solicitation, nor did he ask questions regarding the solicitation (tr. 1/19-20). Langdon's bid was based upon the SOW and some, but not all, of the reference drawings. Langdon requested additional reference drawings after the contract was awarded. (Tr. 1/19-20)

17. Mr. Kurt Steiner was a Navy Shipbuilding Specialist with Assault Craft Unit Five at Marine Corps Base Camp Pendleton for approximately five years (tr. 2/6). Prior to his retirement in 2017, Mr. Steiner was the contract's technical point of contact as the Operations Maintenance Officer (tr. 2/9-10). As the Operations Maintenance Officer, he was responsible for coordination of maintenance of craft within the unit (tr. 2/9). Mr. Steiner was involved in training, operation, and maintenance of LCACs for about 25 years out of his 35 years of combined active duty and civilian service with the Navy (tr. 2/8).

18. Mr. Wesley Magner has served as a craftmaster instructor at ACU-5 since 2022, teaching advanced maneuvering of landing craft (tr. 3/130-31). He currently is serving as a craftmaster, and also has been a landing craft engineer and an operations maintenance officer. Of his 24-year active-duty career, 20 years have been involved with landing craft (tr. 3/132).

19. Mr. Victor Garza is the owner of Fat Boy Fiberglass and Welding, located in San Diego, CA (tr. 3/16). Mr. Garza has been in business for approximately 22 years and has approximately 15 years of experience refurbishing landing craft bow thruster nozzles as a contractor for the Navy (tr. 3/15-17). In that time, he has worked on between 75 to 100 bow thruster nozzles (tr. 3/15).

20. Mr. Garza stated that, of the 75 to 100 bow thruster nozzles he has serviced over the years, he needed to repair either the upper or lower turning vanes on approximately 20 to 30 of them (Mr. Garza refers to the turning vanes as baffles) (tr. 3/19). He further stated that he needed to fully replace the turning vanes on at least two bow thrusters out of the 100 he has refurbished (tr. 3/19-20). When repairing or replacing an interior baffle or turning vane, Mr. Garza said that he follows the specifications, but sometimes adds additional material to make the fiberglass joint stronger. He stated:

> We go a little overkill, you know. I know they have the
> specifications and we do it to the specifications on the type
> of material we use, but it's just like when you weld

7

something, repair something -- remember these are repairs. This isn't a new construction.

(Tr. 3/29)

Mr. Garza also testified that his repairs sometimes would involve cutting or grinding out damaged portions of the interior baffles and replacing them by filling the gaps with epoxy and layering fiberglass over them. According to him, this would make the joint stronger than the original. (Tr. 3/56-58)

## III. Condition of the Bow Thrusters

21. The service life of the landing craft was thought to be approximately 20 years (tr. 3/170). Mr. Steiner estimated that the bow thruster nozzles are made of 98% fiberglass (tr. 2/14). The fiberglass would wear out and aluminum pieces would corrode over time due to exposure from salt water, ultraviolet radiation from sunlight, and sand as the landing craft crosses beaches (tr. 2/13-15). Mr. Steiner stated that as sand is blasted at 300 miles an hour through the nozzle, it would be "basically a sand blaster" (tr. 2/14).

22. The bow thruster nozzles have been used on landing craft since the craft were first manufactured in the 1980's (tr. 2/25). Although the original service life of the landing craft was 20 years, they have now been in operation for more than 30 years (tr. 2/22). In order to extend their service life, the Navy implemented a Service Life Extension Program (SLEP). The SLEP included modifications to the bow thrusters, such as building up a section to divert air higher to accommodate a new, taller radar pedestal (Tr. 2/21-22)

23. The eight specific bow thrusters that the Navy provided to Langdon to be refurbished were not in service and had been sitting around for several years. At the time of the contract, they were between 20 and 30 years old. (Tr. 2/25)

24. According to Mr. Steiner, the purpose of the thickness specifications in the SOW was to establish a *minimum* thickness (tr. 3/173). In his view, repairs must meet the minimum thickness requirement in order to be strong and durable enough to withstand air coming out of the nozzle at up to 300 miles an hour (tr. 3/173-74). As an end-user of the landing craft, he stated that exceeding the minimal thickness requirement would not be a problem, as long as the minimum thickness is met (tr. 3/174).

25. On June 4, 2015, in response to Mr. Swank's request, the Navy emailed six photos of the bow thruster nozzles that Langdon would be required to refurbish under the contract (app. supp. R4, tab 19.055). The photos depicted the condition of the

8

nozzles. For example, photos depicted missing side handles and paint falling off (app. supp. R4, tab 19.057; tr. 1/67, 3/67), interior wear and tear, chipping and cracks, and entire missing interior turning vanes (app. supp. R4, tab 19.060; tr. 2/22, 2/41. 3/71,).

26. With respect to one of the nozzles depicted in the photos, Mr. Garza testified that he previously had performed repair work on the nozzle, including replacing the center turning vane with a fiberglass structure that was stronger than the original (app. supp. R4, tab 32.049; tr. 3/82-86).

## IV. Requirement to Refurbish the Bow Thruster Nozzles

27. To "refurbish" the bow thruster nozzles, Langdon was required to tear apart each nozzle to its constituent parts, bead blast them to remove all the paint and expose any missing or damaged fiberglass, repair the fiberglass structure, and to reassemble the bow thruster nozzles with repaired or replaced components for at least 10 more years of service (61959 R4, tab 1 at 1-3; tr. 1/109-110; 2/13-15, 26 91; 3/64, 71-74 134).

28. Mr. Steiner testified that the term refurbishment meant that "you're going to tear it down, you're going to clean it, [take] all the paint off, and then you're going to, you know, rebuild all the damaged, missing components, repaint it to an as new like condition" (tr. 2/26).

29. According to Mr. Steiner, after completing the repairs, Langdon was required to attach the bow thruster bearings (tr. 2/14-15).

## V. Contract Performance

30. On November 20, 2015, five days before the original contract delivery date of November 25, 2015, Langdon emailed the Navy requesting an extension of the delivery date. Langdon stated that it had several conflicts with other existing contracts which delayed its ability to work on the bow thruster nozzles during the performance period, but it evaluated the eight bow thruster nozzles received and determined that specialized jigs and equipment were required to perform repairs. Langdon proposed new delivery dates—February 5, 2016 for two bow thruster nozzles; February 26, 2016 for another two bow thruster nozzles; March 11, 2016 for another two bow thruster nozzles; and March 25, 2016 for the last two bow thruster nozzles. (61959 R4, tab 26)

31. On December 3, 2015, Mr. Swank sent an email to Contract Specialist Mr. Charles Fletcher explaining that the extension request was due to "several factors to include the existing condition/repairs of the nozzles being beyond the scope of the

SOW and some contractor workload issues" (61959 R4, tab 28 at 708). The Navy accepted Langdon's revised delivery schedule (*id.*).

32. In an email dated February 23, 2016 to Messrs. Fletcher and Steiner, Mr. Swank requested the Navy to send drawings and additional information to "finalize/complete things" (61959 R4, tab 31 at 113). In the email, Mr. Swank stated that he never received the drawings referenced in Section 4.0 of the statement of work (*id.*). Mr. Steiner provided the requested drawings to Mr. Swank the next day via email and mailed the technical manual (*id.*).

33. On June 30, 2015, Mr. Swank emailed Mr. Steiner, stating that Langdon would pick up the bow thrusters between July 25 and August 25, and that Langdon anticipated a duration of 90 to 120 days to complete the work under the Contract (app. supp. R4, tab 19.078 at 176-77).

34. Langdon did not pick up the bow thruster nozzles by either date. On October 8, 2016, the Navy emailed Langdon additional pictures of the bow thruster nozzles banded to crates which contained the bow thruster bearings. (App. supp. R4, tabs 19.100-02; tr. 2/16) Langdon arranged for a carrier to pick up the bow thruster nozzles on October 9, 2015 (app. supp. R4, tab 19.103). Langdon provided no explanation for the delays (tr. 2/25).

35. Mr. O'Donnell issued Modification No. P00002 unilaterally on August 10, 2017 (61959 R4, tab 3). The modification revised the delivery dates to October 20, 2017 for two bow thruster nozzles, January 11, 2018 for four bow thruster nozzles, and March 15, 2018 for two bow thruster nozzles (*id.*). All other terms and conditions remained the same (*id.*). Mr. O'Donnell issued the modification unilaterally because Mr. Swank had requested to deviate from the specifications or perform work outside of the SOW (tr. 1/117; *see also* Navy PFF ¶ 67).

36. Mr. O'Donnell reminded Mr. Swank that, as the CO, he has never authorized any changes to the original scope of work, that the Navy was looking for Langdon to repair and deliver the bow thruster nozzles at the stated contract price, and that costs incurred to develop designs to increase the operational life of the bow thruster nozzles was not a contractual requirement (61959 R4, tab 195 at 212). He warned that failure to deliver 2 bow thruster nozzles by October 20, 2017, would result in a termination of the Contract (*id.* at 213).

37. Langdon did not deliver 2 bow thruster nozzles by October 20, 2017, in accordance with Modification No. P00002 of the Contract (tr. 1/93).

38. On December 11, 2017, Mr. O'Donnell issued a show cause notice to Langdon due to Langdon's failure to deliver 2 bow thruster nozzles by October 20,

2017 (61959 R4, tab 4). The notice provided Langdon 10 days from receipt of the letter to explain its non-performance or be subject to a termination for cause (R4, tab 5).

39. Between December 2017 and March 2018, Langdon submitted a number of email replies to the show cause notice with a number of attached drawings, photos, and other documents (61959 R4, tabs 207-43). In an email dated December 26, 2017, Mr. Swank blamed Langdon's failure to deliver on the alleged discovery of additional original manufacturing deficiencies during Langdon's rebuilding processes (61959 R4, tab 214). He further stated that these new discoveries would require an additional contract modification and that Langdon would need to perform "detailed destructive/disassembly failure analysis" of the eight bow thruster nozzles to determine all historical failures of the bow thruster nozzles (*id.*). Mr. Swank stated that he would provide cost information for the additional out of scope repairs (*id.*).

40. In a March 7, 2018 email, designated as one of seven emails in response to the show cause notice, Mr. Swank reiterated that Langdon's inspection had discovered new "covered and hidden" structural defects with respect to the central turning vane and associated connections to the inner walls of the bow thruster nozzles resulting from alleged OEM design defects and substandard prior repairs by others (61959 R4, tab 236). Mr. Swank stated that, if Langdon had performed repairs in accordance with the SOW and its own Mod. No. 1 design and methods, the "repairs would have failed" due to the "covered and hidden" defects in the central turning vane structure (*id.* at 9). He contended that Langdon's proposed repairs were necessary to bring the bow thruster nozzles in compliance with the design specifications and that Langdon could not knowingly perform repairs in accordance with the SOW without violating laws and professional standards due to risk to life and safety (*id.* at 10). He also complained that the Navy had repeatedly refused to negotiate a mutually acceptable contract modification addressing the outstanding issues (*id.*). None of the responses to the show cause notice indicated whether Langdon would complete performance, nor did the responses provide a delivery date for the 8 bow thruster nozzles.

41. Langdon did not deliver refurbished bow thruster nozzles to the Navy by the March 15, 2018 deadline (61959 R4, tab 9 at 44).

## VI. Procedural History

42. In a letter dated September 27, 2018, the CO, Mr. O'Donnell, issued a termination for cause pursuant to FAR 52.212-4(m) (61959 R4, tab 9). The termination decision stated that Langdon was in default due to its failure to refurbish and deliver the bow thruster nozzles by the dates established in the contract. The decision acknowledged Langdon's responses to the show cause notice, but stated that the government had the right to insist on strict and timely compliance with contract

11

specifications and Langdon's claims of OEM manufacturing and design deficiencies based on the OEM's own design drawings were not an adequate excuse for its non-performance. (*Id.* at 42-43) Mr. O'Donnell stated that the contract SOW required a complete refurbishment that included any damaged, deteriorated or missing fiberglass (*id.* at 43). Lastly, the termination decision requested that Langdon return the bow thruster nozzles to the Navy by October 26, 2018, or the Navy would seek reimbursement for the costs of the bow thruster nozzles (*id.* at 44).

43. On February 5, 2019, the Board docketed Langdon's appeal from the termination decision as ASBCA No. 61959.

44. After Langdon failed to return the bow thruster nozzles post-termination, by letter dated April 16, 2019, Mr. O'Donnell requested reimbursement in the total amount of $192,000 for the eight bow thruster nozzles. The letter instructed Langdon to remit payment to the U.S. Treasury. (App. supp. R4, tab 19.749)

45. On November 10, 2022, during the pendency of ASBCA No. 61959, Langdon filed a monetary claim addressed to CO Jose Gomez. (ASBCA No. 63501 R4, tab 1). The 13-page claim document sought damages for a sum total of $730,000 alleging breach of contract and constructive change under the defective specifications and superior knowledge theories of recovery (*id.*). The total was broken into primarily two categories, pre-termination costs totaling $288,000 and post-termination costs totaling $442,000, which were further itemized into 44 separate elements for alleged labor and materials costs for repair materials, storage of the bow thrusters, legal expenses, engineering reports, and travel costs.

DECISION

## I. Whether the Navy's Termination for Cause Was Justified

The principles governing a termination for default apply to a termination for cause. *Bulova Techs. Ordnance Sys. LLC*, ASBCA No. 59089, 18-1 BCA ¶ 37,183 at 180,981. A termination for default "is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969)). Although Langdon brought the appeal, because a termination for default is essentially a government claim, the government bears the initial burden of proving, by a preponderance of the evidence, that a termination for default was justified. *Lisbon Contractors*, 828 F.2d at 764-65; *DayDanyon Corp.*, ASBCA No. 57681, 15-1 BCA ¶ 36,073 at 176,151.

Once the government establishes its *prima facie* case that the termination for cause was proper, the burden shifts to the contractor to prove that its failure to perform

was beyond its control and without its fault or negligence. *Bulova*, 18-1 BCA ¶ 37,183 at 180,987. The contractor must show that that its nonperformance was excusable or due to the government's material breach, or that the CO's decision was arbitrary, capricious, or an abuse of discretion. *Id.*

Here, the Navy has satisfied its initial burden of demonstrating that the termination for cause was justified. It is undisputed that Langdon failed to deliver any of the bow thrusters, despite the Navy granting two significant schedule extensions— the first for one year, and the second for another two years beyond the original delivery date of November 25, 2015 (findings 14-15, 32-41). Moreover, Langdon failed to adequately respond to the Navy's show cause order. Although Langdon made various assertions regarding the condition of the bow thrusters and alleged that the thrusters were plagued with OEM defects, Langdon failed to provide a new delivery date or any assurances that it would complete the work. Instead, Langdon insisted that it could not complete the work without violating laws and professional standards. (Findings 38-41) Accordingly, the Navy has met its initial burden.

### A. Langdon Has Not Demonstrated That Its Failure to Perform Was Excusable

Once the Navy has demonstrated that the termination for cause is justified, the burden shifts to the appellant to demonstrate that its failure to perform was excusable. *Bulova Technologies Ordnance Systems, LLC*, ASBCA No. 59089, 18-1 BCA ¶ 37,183 at 180,987.

Langdon contends that the CO blocked it from performing by refusing to modify the contract in order to address the alleged manufacturing defects in the bow thrusters (app. br. at 6). According to Langdon, refurbishing the bow thrusters would cause it to "violate the contract documents and specifications" by having OEM manufacturing defects (*id.*).

As we discuss below, Langdon has failed to demonstrate that the bow thrusters had manufacturing defects or non-compliant prior repairs that prevented Langdon from performing according to the statement of work. Because the Navy had no reason to modify the contract to address the alleged issues, Langdon has not demonstrated that its failure to perform was excusable.

### 1. Whether The Statement of Work Was Defective

Determining what the contract requires is a matter of contract interpretation and begins with the plain language of the contract. Generally, this process begins and ends with the language of the contract. *H2LI-CSC, JV*, ASBCA No. 62086, 21-1 BCA ¶ 37,956 at 184,338-39 (citing *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d

1329, 1338 (Fed. Cir. 2006)).  In reviewing the language, the Board should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922 (citations omitted); *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract").  However, if a contract provision is "susceptible to more than one reasonable interpretation, it is ambiguous." *TEG-Paradigm*, 465 F.3d at 1338 (citing *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986)).

According to Langdon, the language of the SOW "clearly *did* limit a portion of Langdon's performance obligations to *only* damage resulting from saltwater/ultraviolet/sandblast exposure" (app. br. at 9) (emphasis added).  Langdon interprets the SOW to "limit repairs to '*minor*' structural damage or fiberglass surface wear and tear," rather than the repair and replacement of "any" damaged or missing fiberglass components (*id.* at 9-10) (emphasis included).  Specifically, Langdon contends that the replacement of damaged and missing fiberglass components—such as the central turning vanes—fell outside the scope of work (*id.* at 9).

Langdon's interpretation of the SOW is unreasonable and inconsistent with the plain language of the SOW.  First, Langdon's interpretation places undue emphasis on the sentence in Section 2.0 of the SOW stating that "[d]ue to the cumulative effects of saltwater/ultraviolet/sandblast exposure, the Bow Thruster Nozzles have reached the end of their intended service life." (Finding 7)  This statement in no way restricts the work to repairing only damage resulting exclusively from exposure to saltwater, ultraviolet radiation, and sandblast.  Rather, it provides an explanation of the various types of damage encountered during the service life of the bow thrusters and does not limit or restrict the repair work in any way.

Next, Section 3.0 of the SOW provides more explicit instructions regarding the actual work that must be accomplished, stating that each bow thruster nozzle must be "completely disassembled with all mechanically fastened components removed and glass bead blasted clean then visually inspected for damage."  In addition, Section 3.2 requires the contractor to repair or replace "any damaged components," while section 3.3 requires that "[a]ll existing paint on the fiberglass structure will be removed" and that "[a]ny damaged, deteriorated or missing fiberglass will be repaired/renewed/installed ensuring all reference [drawing] dimensions are maintained." (Finding 8)  These requirements expressly exceed Langdon's narrow interpretation of the SOW as being restricted to the repair of "'minor' structural damage or fiberglass surface wear and tear" (app. br. at 9).  Moreover, contrary to Langdon's narrow interpretation (*id.*), these requirements specifically contemplate the replacement of missing fiberglass components, such as the internal turning vanes.

14

Moreover, it is important to read the Background Section 2.0 together with the General Requirements of Section 3.0 so as to give full meaning to both provisions. *H2LI-CSC, JV*, 21-1 BCA ¶37,956 at 184,339. Langdon's interpretation is unreasonable, because it ignores the express instructions in Section 3.0 to "remove," "repair," "renew," or "replace" "damaged, deteriorated or missing fiberglass components." Reading the two sections together plainly requires the contractor to repair or replace any fiberglass structures (such as the turning vanes) if they were damaged for any reason, including because of sandblast, ultraviolet radiation, or saltwater exposure.

Langdon next argues that the design specifications referenced in the SOW were defective, because the bow thrusters it received were not consistent with the original equipment manufacturer (OEM) drawings. According to Langdon, Section 4.0 of the SOW is controlling and requires that "all specifications, tolerances, details and references on the [OEM] drawings must be followed in the performance of this contract" (app. br. at 11). Langdon argues that extensive damage arising from pre-existing OEM manufacturing defects and non-compliant prior repairs prevented it from adhering to the SOW. According to Langdon, correcting the alleged defects would violate the design drawings and specifications, placing Langdon in a "Catch 22" situation. (App. br. at 12)

We see no contradiction between the General requirements of Section 3.0 and the Performance requirements of Section 4.0, which states that the repairs must be conducted in accordance with the reference drawings (finding 9). The testimony of Mr. Garza, the owner of Fat Boy Fiberglass and Welding, a witness offered by Langdon, demonstrates that refurbishment can be conducted in a manner consistent with the OEM reference drawings and specifications (findings, 19, 20). As Mr. Garza testified, it was not unusual to repair or replace the inner baffles, or turning vanes, on the bow thruster nozzles. He explained that, when he repairs or replaces the baffles, he follows the specifications but sometimes adds additional material to make the fiberglass joints stronger. He also testified that his repairs sometimes would involve cutting or grinding out damaged portions of the interior baffles and replacing them by filling the gaps with epoxy and layering fiberglass over them. According to him, this would make the joint stronger than the original. (Finding 20) We conclude that such an approach is entirely reasonable and fully consistent with the contract.

Taking its argument further, Langdon contends that performance in accordance with the SOW would subject the bow thrusters to operational failure and expose Langdon to civil and criminal liability (app. supp. R4, tab 39.001 at 5-10). We previously rejected this argument in our summary judgment decision. *Langdon Eng'g & Mgt.*, 21-1 BCA ¶ 37,810 at 183,621 (rejecting as irrelevant Langdon's contention that performance would have violated unnamed laws).

## 2. The Bow Thrusters Did Not Differ Materially From the OEM Drawings

In our previous ruling on the Navy's motion for summary judgment, the Board concluded that Langdon had established a dispute as to a single material fact: whether or not the bow thrusters provided by the Navy differed materially from the OEM drawings and, therefore, could not be refurbished as required by the contract. *Langdon Eng'g & Mgt.*, 21-1 BCA ¶ 37,810 at 183,623.

The contemporaneous correspondence demonstrates that Mr. Swank was convinced that the bow thrusters he received contained "major structural/mechanical engineering deficiencies" that were only exposed when he began working on them, and that the "basic design of the units . . . are faulty with regards to the original manufacturer."  He further believed that, if he completed the repairs pursuant to the SOW, the "units will fail again and we can't allow such under our professional liability requirements."  (R4, tab 65 at 486-88)  He claimed that "these major deficiencies were not physically obvious and some had been covered over by superficial prior repairs that were not performed as they should have been" (*id.* at 486).

Despite Mr. Swank's insistence, he has not satisfactorily demonstrated that the bow thrusters contained OEM manufacturing defects that prevented him from completing the refurbishment consistent with the SOW.  For example, Mr. Swank argues that the previous repairs to the bow thrusters were defective, because the repaired central turning vane was 0.75" thick, rather than the OEM specification of 0.25" thickness (app. resp. to Navy PFF ¶ 18).  He further argued that the bow thrusters were defective because some of them had a gap between the interior wall and the turning vanes (tr. 2/67-68).  On certain units, the gap had been filled with epoxy and covered over with fiberglass (*id.*).

In our view, the purported out-of-specification measurements on certain bow thrusters are consistent with prevailing techniques of fiberglass repair, as evidenced by the owner of Fat Boy Fiberglass and Welding, Mr. Garza.  Mr. Garza testified that it was not unusual to repair or replace the turning vanes and that sometimes he must add additional material to make the fiberglass joints stronger.  In particular, he would cut or grind out damaged portions and replace them by filling the gaps with epoxy and layering fiberglass over them.  (Findings 19-20)  The fact that another contractor had previously repaired the bow thrusters does not demonstrate that the thrusters had OEM defects.  Moreover, the fact that portions of some thrusters had out-of-specification measurements does not establish that the previous repairs were faulty or otherwise non-compliant.  Indeed, evidence of previous repairs is entirely consistent with the fact that the bow thruster nozzles have been used on LCACs since they were first manufactured in the 1980's (findings 21-23).  We conclude that Langdon has not

16

demonstrated that the bow thrusters it received contained pre-existing OEM manufacturing defects.

Moreover, Langdon's arguments fail to establish that non-compliant prior repairs prevented Langdon from fulfilling its contractual duty to refurbish the bow thrusters consistent with the SOW. The fact that previously repaired bow thrusters may not have complied with the OEM specifications for wall thickness should not have prevented Langdon from refurbishing them. Mr. Swank introduced no evidence that this alleged defect prevented Langdon from making the repairs. Instead, Langdon relied entirely upon Mr. Swank's opinion that repairing the bow thrusters to comply with the OEM specifications would cause Langdon to violate its professional liability requirements. We did not find Mr. Swank's opinion to be persuasive.

As the testimony of other contractors established, it was possible to refurbish the bow thrusters consistent with the OEM drawings (finding 20). For example, during the hearing, the Navy presented a series of photos of the bow thrusters that the Navy had sent to Langdon at Langdon's request (finding 25). The photos depicted various states of disrepair, including missing and damaged components such as missing vanes (tr. 2/22-23; 3/71, 137). On one unit, the entire central turning vane was "blown out" (tr. 2/41). During the hearing, Mr. Garza, the owner of Fat Boy Fiberglass and Welding, testified that repairing the missing piece of the upper turning vane was "a walk in the park" and that, after the repair, the fiberglass structure would be stronger than before (tr. 3/82-85). Moreover, Langdon was aware that other contractors had successfully refurbished other LCAC bow thrusters, because Mr. Swank sought a quote from L-3 Unidyne, Inc., who represented that it recently had completed refurbishment on a similar landing craft (finding 2). Although Mr. Swank asserts that Mr. Garza's repairs were not consistent with the OEM drawings or specifications, he provided no evidence to support this assertion (app. br. at 13), other than his personal opinion.

Finally, if Langdon believed the SOW was ambiguous, Langdon had a duty to inquire to clarify the ambiguity. Indeed, if the ambiguity is obvious and a contractor fails to inquire with regard to the provision, its interpretation will fail. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004) (citing *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed.Cir.1997)). Here, if Langdon believed that the OEM drawings and specifications were ambiguous, it should have raised this issue at the outset of the contract, rather than waiting until after the original delivery date (findings 32, 39). *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579-80 (Fed. Cir. 1993) (holding that where a contractor alleges a discrepancy in the contract drawings, the contractor may be required to seek clarification) (citing *Jefferson Constr. Co. v. United States*, 364 F.2d 420 (1966), *cert. denied*, 386 U.S. 914 (1967)). Langdon admits that it did not take any exceptions or ask questions regarding the SOW prior to contract award (app. br. at 10).

### 3. Whether Performance Was Commercially Impracticable

Langdon's next argument is that it was commercially impracticable to perform, because doing so would cause extreme and unreasonable difficulty. Langdon claims that it has suffered a cost overrun of 400 percent, demonstrating the unreasonable nature of completing the SOW. (App. br. at 14-15)

Because this was a firm fixed-price contract (finding 1), Langdon bears the risk of cost overruns. *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996); *Parsons Gov't Servs., Inc.*, ASBCA No. 61630, 20-1 BCA ¶ 37,655 at 182,815. To establish commercial impracticability in the context of a firm fixed-price contract, a contractor must show that a supervening event, after it entered into the contract, made performance impracticable. The contractor also must show that the event's non-occurrence was a basic assumption upon which the contract was based and that the occurrence of the event was not the contractor's fault. Finally, the contractor must show that it did not assume the risk of occurrence. In firm fixed-price contracts, the contractor typically assumes the risk of unexpected costs and performance difficulties. *Spindler Constr. Corp.*, ASBCA No. 55007, 06-2 ¶ 33,376 at 165,463 (citing *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294-95 (Fed. Cir. 2002) (setting forth the elements of commercial impracticability in the context of a firm fixed-price contract)).

Here, Langdon argues that "the appearance of the OEM defects and the governments [sic] unwillingness to negotiate a resolution of any type by changing the specifications" was a supervening event that made performance impracticable (app. br. at 15). This contention, even if true, is insufficient to establish commercial impracticability. Even if Langdon could establish that the bow thrusters were defective (which we've concluded it has not), Langdon has not demonstrated that the alleged defects made performance impracticable. Indeed, as we've previously discussed, other contractors were able to refurbish the bow thrusters consistent with OEM drawings, including replacing missing and blown out turning vanes (findings 19-20).

Langdon further argues that, based on the costs it was incurring, the work that it was doing was more akin to *remanufacturing* rather than *refurbishing* the bow thrusters. According to Langdon, the only way it could proceed without violating the contract specification would have been to demolish and remove all eight turning vanes and central splitters and then remanufacture and install new ones (app. reply at 8). However, this is precisely what Fat Boy did (finding 20) and Langdon did not demonstrate at the hearing that doing so would have been necessary for every bow thruster, nor did it establish that doing so would have been commercially impracticable.

18

For example, Langdon's claim that it cost 400% more than it expected to perform is unsubstantiated (app. br. at 14-15). Langdon attempts to use its cost accounting submission attached to its post-hearing brief as evidence to support its purported cost overruns (finding 48). We will not re-open the record to accept new evidence, particularly when the Navy has not had an opportunity to review the evidence prior to the hearing. *See* Board Rule 13(c); *T&M Distributors, Inc.*, ASBCA No. 51279, 01-2 BCA ¶ 31,442 at 155,276. Indeed, appellant's submission after the hearing does not represent newly discovered evidence. Langdon was on notice and had an opportunity to introduce this evidence prior to or at the hearing but did not do so.

However, even if we accept Langdon's proffered evidence, it does not change our conclusion that completing the contract was not commercially impracticable. Langdon relies upon *Raytheon v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002), to support its conclusion that a cost overrun of 400 percent in refurbishing the bow thrusters was commercially impracticable (app. br. at 14-15). Langdon's reliance upon *Raytheon* is misplaced, because *Raytheon* does not hold that a cost overrun, by itself, means that a contract is commercially impracticable. Instead, Raytheon holds that a contract is commercially impracticable if its performance would cause "extreme and unreasonable difficulty, expense, injury or loss to one of the parties." *Raytheon*, 305 F.3d at 1367. A cost overrun of 400%, even if substantiated, is not itself sufficient to establish commercial impracticability. *See also Spindler*, 06-02 ¶ 33,376 at 165,462-63 (holding that cost overruns alone are insufficient to establish commercial impracticability in a firm fixed-price contract).

## 4. Whether the Navy Failed to Disclose Superior Knowledge

Langdon next argues that the Navy breached the contract by failing to disclose superior knowledge of the condition of the bow thruster nozzles (app. br. at 15-18).

As we stated above, the contractor in a fixed price contract bears the risk of unexpected costs. *Dalton,* 98 F.3d at 1305. However, under the superior knowledge doctrine, contracting agencies have an implied duty to disclose otherwise unavailable information that is vital to the contract performance. The doctrine of superior knowledge is premised upon the notion that where "the government has knowledge of vital information that will affect a contractor's performance, the government is obligated to share that information." *Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,538 (citing *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774 (Ct. Cl. 1963)); *see also Hercules, Inc. v. United States*, 24 F.3d 188, 196-97 (Fed. Cir. 1994). The elements of the cause of action, as set forth in *Hercules*, are that (1) the contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware that the contractor lacked the knowledge and would not have reason to obtain it; (3) any contract

19

specification provided either misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. 24 F.3d at 196.

Langdon argues that it satisfies all four elements set forth in *Hercules*. With respect to element one, Langdon argues that it undertook performance without knowledge of OEM defects and non-compliant prior repairs to the bow thrusters (app. br. at 16).

Langdon asserts that the government was aware that Langdon had not previously refurbished bow thrusters for the Navy (*id.*). Langdon further asserts that the contract specifications failed to indicate the OEM defects and that the Navy failed to inform Langdon that previous repair work had been performed out of specifications. (App. br. at 16-17).

Langdon's assertions fail to satisfy the elements of the superior knowledge doctrine. First, the record demonstrates that Langdon should have been aware of the condition of bow thrusters at the outset of the contract. The SOW of the contract expressly stated that the bow thrusters had reached or exceeded their intended service life and that the bow thrusters had been damaged from the cumulative effects of exposure to saltwater, ultraviolet radiation, and sandblast (finding 7). The SOW further required Langdon to repair or install any damaged, deteriorated, or missing fiberglass, as well as damaged or missing components (finding 8. Thus, Langdon should have been aware of the condition of the bow thruster nozzles from the beginning of the contract. Indeed, the condition of the bow thrusters as depicted in the pictures that Langdon received (finding 25) is fully consistent with the contract SOW, which required Langdon to repair and replace missing and damaged components (finding 8).

Langdon presented no evidence that the Navy was aware of the alleged OEM defects before entering into the contract with Langdon, nor has Langdon demonstrated that the Navy was aware that the previous repairs performed by Fat Boy were non-compliant. With respect to the final element set forth in *Hercules*, the Navy made no effort to hide the condition of the bow thrusters or otherwise fail to inform Langdon of their condition, as evidenced by its willingness to send photos.

**B. Whether the Navy Breached the Implied Duty of Good Faith and Fair Dealing**

"The duty of good faith and fair dealing is inherent in every contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010). The duty prohibits a party to a contract from interfering with another party's rights under the contract. *Id.* But not all misbehavior breaches the implied duty of good faith and fair dealing. *Id.* at 829. Specifically, the implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those that are expressly set forth in the contract, nor can it be used to create new duties inconsistent with the contract's provisions. *Id.* at 831; *Century Expl. New Orleans, LLC v. United States*, 745 F.3d 1168, 1179 (Fed. Cir. 2014). With respect to the duty of good faith and fair dealing, breach requires interference with performance or failure to cooperate that deprives the other party of the benefits for which the party bargained. *See Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) ("an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision.")

Langdon has produced no evidence that the Navy acted wrongfully in its management of the contract. Langdon's argument on this point merely repeats its earlier arguments that the Navy should have agreed to a change order to accommodate the alleged OEM defects.

Instead, we conclude that the Navy reasonably cooperated with Langdon. For example, when Mr. Swank requested that the Navy send drawings and additional information, the Navy promptly responded by sending the requested information the next day (finding 32). The Navy also sent pictures of the bow thrusters in response to Mr. Swank's request (finding 34).

In our view, the Navy exhibited remarkable forbearance, offering multiple extensions of the contract deadline, including agreeing to an extension when Langdon made the request only five days before the original deadline (findings 30, 31). Indeed, the Navy did not issue its show cause order until more than two years past the original delivery date; again, showing considerable forbearance (finding 38).

**C. Whether the Termination Decision Was Arbitrary, Capricious, or an Abuse of Discretion**

Langdon contends that the CO's decision to terminate the contract for cause was not reasonable. Langdon contends that the bow thrusters had OEM manufacturing defects that prevented Langdon from finishing the repairs (app. br. at 3). According to

21

Langdon, the only way it could have finished the repairs would have been to violate the contract documents and specifications, which the contract prohibited it from doing (*id.*). Langdon asked the Navy for a modification to resolve the issue, but the CO refused, putting Langdon into "a catch 22 position" (*id.*).

Regarding the revised schedule set forth in Modification No. 002, Langdon contends that it refused to sign the modification because it did not address the alleged OEM manufacturing defects (app. br. at 4).

This is a re-iteration of Langdon's earlier argument and does not persuade us that the CO acted unreasonably when he terminated the contract for cause. Instead, the record demonstrates that the CO acted reasonably when confronted with Langdon's failure to deliver any of the bow thrusters within the extended delivery schedule.

The consequences of "violating the contract documents and specifications" by replacing or replacing alleged OEM manufacturing defects simply do not rise to the level of concern that Langdon alleges. Langdon argues that extensive damage arising from pre-existing OEM manufacturing defects and non-compliant prior repairs prevented it from adhering to the SOW. Taking its argument further, Langdon contends that performance in accordance with the SOW would subject the bow thrusters to operational failure and expose Langdon to civil and criminal liability (app. supp. R4, tab 39.001 at 5-10).

As the Board previously held, Langdon's speculative concerns about operational failure and civil and criminal liability are not relevant to whether the Navy acted reasonably in terminating the contract for cause. *Langdon Eng'g & Mgt.*, 21-1 BCA ¶ 37,810 at 183,621-22. Moreover, Langdon has failed to convince us that the bow thrusters contained significant manufacturing defects or evidence of previous repairs that were materially inconsistent with OEM drawings. While it is entirely possible that previous repairs resulted in fiberglass thicknesses for certain components that differed from the OEM specs, there is no evidence that the previous repairs were defective. Indeed, the owner of Fat Boy Fiberglass and Welding, Victor Garza, testified that sometimes his repairs would involve cutting or grinding out damaged portions of the interior baffles and replacing them by filling the gaps with epoxy and layering fiberglass over them. According to him, this would make the joint stronger than the original. (Finding 20)

Finally, Langdon's consistent failure to meet the delivery deadlines, even when given significant leeway, coupled with its failure to provide assurances that it would complete performance upon receipt of a show cause order, supports the reasonableness of the CO's decision to terminate the contract. For example, On June 30, 2015, Langdon stated that it would pick up the bow thrusters between July 25 and August 25 and that it would take between 90 to 120 days to complete the work under the Contract

22

(finding 33). However, Langdon did not pick up the bow thruster nozzles by either date and did not provide an explanation for its delay (finding 34). Langdon finally picked up the bow thrusters on October 9, 2017 (*id.*).

On August 10, 2017, in light of Langdon's failure to meet the initial delivery deadline, the CO unilaterally revised the delivery dates until October 2017 for the first two thrusters, January 2018 for four thrusters, and March 2018 for the remaining two thrusters (finding 35). Langdon did not deliver two bow thruster nozzles by October 20, 2017 in accordance with the modified delivery schedule (finding 37).

We conclude that the CO's new delivery schedule was reasonable. In setting a new delivery date, the government must either agree with appellant as to a new delivery schedule or give appellant notice of a new delivery schedule which would be reasonable under the circumstances. *Thunderstruck Signs*, ASBCA No. 61027, 17-1 BCA ¶ 36,835 at 179,505-06) (citing *Oklahoma Aerotronics, Inc.*, ASBCA No. 25605 et al., 87-2 BCA ¶ 19,917 at 100,775). In particular, when the government acts unilaterally to notify a contractor of a new delivery schedule, that schedule must be reasonable "from the standpoint of the performance capabilities of the contractor at the time the notice is given." *Int'l Tel. & Tel. Corp., ITT Defense Communications Division v. United States*, 509 F.2d 541, 548 (1975). Here, the new schedule was consistent with Langdon's original delivery schedule, which contemplated completing all eight bow thrusters within a six-month period (finding 10). By spacing the deliveries out roughly every three months, with the final thrusters due within five months, the new schedule was reasonable and consistent with the original schedule. Moreover, the new schedule was more relaxed than the 90-120-day schedule that Langdon represented it could meet (finding 33). We conclude that the Navy's unilateral delivery schedule was reasonable and within Langdon's performance capabilities at the time. *See McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1019 (Fed. Cir. 2003) (holding that reasonableness of unilateral schedule is based upon what the government "knew or should have known" at the time).

Langdon failed to meet the new schedule (finding 37). On December 11, 2017, the CO issued a show cause notice to Langdon. The notice provided Langdon 10 days from receipt of the letter to explain its non-performance or be subject to a termination for cause (finding 38). Langdon's responses to the show cause order served up a variety of excuses without providing a reasonable explanation for why it could not meet the new delivery schedule. Langdon's principal excuse was that it discovered hidden defects and alleged original manufacturing deficiencies during the rebuilding process (finding 39). As we previously have held, Langdon has not satisfactorily demonstrated that the bow thrusters contained original manufacturing defects that prevented Langdon from completing the refurbishment consistent with the statement of work. In further response to the show cause notice, Langdon asserted that it discovered new defects that would require it to perform a "detailed

23

destructive/disassembly failure analysis" of the eight bow thruster nozzles to determine all historical failures of the bow thruster nozzles (finding 39). As we previously found, Langdon provided no evidence that the alleged defects prevented it from making the repairs. Moreover, the testimony of another experienced contractor established that it was able to refurbish bow thrusters in a similar condition, demonstrating that Langdon should have been able to accomplish the refurbishment (finding 20).

Tellingly, none of Langdon's responses to the show cause notice indicated whether Langdon would complete performance or provide a delivery date for the eight bow thruster nozzles (finding 40). Ultimately, Langdon did not deliver refurbished bow thruster nozzles to the Navy by the March 15, 2018 deadline (finding 41). For these reasons, the Navy's decision to terminate was reasonable.

## II.     Langdon Has Failed to Establish Entitlement to any Costs

We have found that Langdon is not entitled to recover for its claims of breach of contract and, therefore, cannot receive monetary compensation for breach of contract. In addition, we have found that the Navy's decision to terminate the contract for cause was reasonable and that Langdon has not demonstrated that its failure to complete the work was excusable.

Pursuant to FAR 52.212-4(m), "[i]n the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law." Accordingly, because Langdon was in default and because it never delivered any refurbished bow thrusters, the Navy is not liable for Langdon's costs.

In addition, Langdon is not entitled to recover its increased costs for what it alleges are "out-of-scope" repairs. Pursuant to FAR 16.202-1, a firm-fixed-price contract is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. FAR 16.202-1. As a factual matter, the record demonstrates that the CO did not authorize any changes to the scope of work of the contract (finding 36). The CO is the only official with actual authority to enter into and modify contracts. *Sauer, Inc.*, ASBCA No. 61847, 21-1 BCA ¶ 37,939 ("When a contract expressly provides that only the CO has the authority to change a contract (or task order), other government employees do not possess actual express or implied authority to change the contract (or task order)."). Consequently, Langdon cannot recover its alleged out of scope costs, because the CO did not authorize it to incur those costs.

24

Finally, we hold that Langdon is not entitled to recover its litigation expenses or the expenses related to the defense of these appeals. FAR 31.205-47(f)(1) provides that costs are unallowable if they are incurred in "defense against Federal Government claims or appeals or the prosecution of claims or appeals against the Federal Government." Because these appeals involve claims against the government, professional and consulting fees are not recoverable. *See Creative Times Dayschool, Inc.*, ASBCA Nos. 59507, 59779, 16-1 BCA ¶ 36,535 at 177,983-84 (holding that appellant may not recover legal and consulting fees incurred in the preparation of a claim against the government).

CONCLUSION

For the foregoing reasons, we deny the appeals.

Dated: June 3, 2025

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61959, Appeal of Langdon Engineering & Mgt, rendered in conformance with the Board's Charter.

Dated: June 3, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals